No. 43,232

Tom Miller Yeates, *Appellant,* v. Edwin M. Harms and St. Francis Hospital & School of Nursing, Inc., a Corporation, *Appellees.*

(393 P. 2d 982)

Opinion filed July 14, 1964.

*Gerald L. Michaud,* of Wichita, argued the cause, and *Russell Cranmer, Thomas A. Wood,* and *M. William Syrios,* all of Wichita, were with him on the briefs for the appellant.

*Donald R. Newkirk,* of Wichita, argued the cause, and *Wayne Coulson, Paul R. Kitch, Dale M. Stucky, Robert J. Hill, Gerrit H. Wormhoudt, Philip Kassebaum, John E. Rees, Robert T. Cornwell, Willard B. Thompson,* and *David W. Buxton,* all of Wichita, were with him on the briefs for the appellee, Edwin M. Harms. *Hugo T. Wedell,* of counsel.

*J. Francis Hesse,* of Wichita, argued the cause, and *Emmet A. Blaes, Roetzel Jochems, Robert G. Braden, James W. Sargent, Stanley E. Wisdom, Cecil E. Merkel, Harry L. Hobson, Bruce W. Zuercher, L. D. Klenda, Charles M. Cline,* and *Richard A. Loyd,* all of Wichita, were with him on the briefs for the appellee, St. Francis Hospital & School of Nursing, Inc.

The opinion of the court was delivered by

Robb, J.: This is an appeal from the trial court's order of May 24, 1962, sustaining the defendant hospital's demurrer to plaintiff's evidence, and orders of June 11, 1962, (1) overruling plaintiff's motion to set aside its ruling on the above demurrer (2) granting judgment to defendants, and (3) overruling plaintiff's motion for new trial.

Prior to June 13, 1959, plaintiff, then fifty-one years of age, was employed as a boat and motor salesman, he repossessed automobiles, trucks, and trailers for banks and loan companies, and did some private detective work for a few clients.

Plaintiff had noticed his eyes were failing and had previously gone to an optometrist who referred him to defendant, Doctor Edwin M. Harms, an ophthalmologist. On January 19, 1959, plaintiff, accompanied by his mother, had gone to Doctor Harms' office where a complete examination of his eyes disclosed he had a cataract condition in both of them, but the condition of his left eye was the worst. Harms told him there was no treatment for cataracts, that only surgery could help, but there was no danger of losing either the eyesight or the eye. It was a delicate operation but not serious and he had done lots of them. Harms stated that after the operation with the use of corrected cataract lenses, plaintiff should be able to see as he had when he was twenty years of age. In reply to a question asked by plaintiff's mother, Harms reiterated the same statement. Plaintiff was directed to return in six months for another eye examination.

The foregoing conversation was admitted only as to Harms and the jury was admonished to disregard it so far as the hospital was concerned.

From January 19, 1959, to June 5, 1959, when Harms gave plaintiff another examination, plaintiff noticed no change in his ability to see but Harms told him and his mother the cataracts had progressed and should be removed by surgery. Plaintiff said,

"Doctor, when you start fooling with a man's eyes it is the most precious thing he has. I want it sure. I rather continue the way I am than to take any chances whatever."

In response to the above Harms assured plaintiff there was "nothing to it." The surgery was "an absolute science" and "there was no danger at all." Plaintiff's cataracts were the "garden variety of cataracts, just the simplest type" according to Harms. He then explained the operating procedure when he would go in and cut the eyeball and take the cataract out. A room was reserved for plaintiff in the defendant hospital for June 8, 1959, at 3:00 p. m.

The above conversation was likewise admitted only as to Harms and stricken so far as the hospital was concerned and the jury admonished accordingly.

At 7:00 a. m. on June 9, 1959, plaintiff was given a large capsule and about 7:15 or 7:20 a. m. he was given a shot in the arm which did not make him lose consciousness. He overheard some conversa-

tion about a capsule he was supposed to have had the night before. He told Harms he had not received such a capsule and Harms said:

"Well, I am going to see to it. I am going to see that my preoperative orders and instructions are carried out."

Plaintiff's left eye was operated first. On June 10, 1959, at 8:30 a. m. Harms, in company with Doctor Tippen, removed the metal shield covering the eye, the bandages, and explored the eye with a small light. Harms commented that he had left "some of the lens in there." Doctor Tippen said, "Yes, you did. There is some in there." Plaintiff asked Harms what that meant and Harms said to plaintiff, "Oh, it will absorb."

The jury at this point in the evidence was admonished not to consider the foregoing conversation with regard to the hospital.

The metal plate and bandage remained on plaintiff's left eye for three or four days and on June 12, Harms looked at the left eye and said it was "coming along fine."

On June 13, 1959, Harms performed cataract surgery on the right eye. Plaintiff had been given a capsule at 9:00 p. m. on June 12, and another capsule and a shot the next morning. He felt no cutting on the right eye as he had on the left. When the anesthetic wore off his right eye had the same postoperative dull ache he had experienced with his left eye. The following morning Harms removed the metal plate and the bandage from plaintiff's eye and put some medication therein but he did not examine the right eye with a light as he previously had the left. On June 14, Harms went out of town and about 11:00 that same morning plaintiff experienced a terrific pain behind his right eye. He called the nurse and told her of the pain and stated he thought something must be wrong, that something was bound to be wrong, and she said she could not give him a shot except one every four hours. The nurse's testimony was stricken as to Harms but admitted as to the hospital.

About two hours and fifteen minutes after the first shot, plaintiff called the nurse and asked her to get in touch with Harms but she stated she could not do so. His mother asked the nurse to send in an interne. He asked her to send an interne or house doctor because something was radically wrong, he did not want to take any chance of losing his sight if he had to call ten doctors. The nurse stated she could not do that because Harms had left no instructions to that effect with the result that plaintiff saw no doctor from 8:00

or 9:00 a. m. on June 14 until Harms returned around 1:00 or 2:00 p. m. on June 15, 1959.

Plaintiff told Harms about the terrible pain he had had and when Harms examined plaintiff's right eye, he said, "Oh, darn! That eye has got infection in it, it could have only happened during surgery."

Harms could not tell plaintiff the extent of damage. He told plaintiff several things could have happened but the germ had to get in while the eye was open and it could have been on the instrument or in the solution that was used. The eye could not be brought back. Harms told plaintiff it was regrettable, he was very sorry it had happened, but he could not sit down and cry with his patients. Harms prescribed hot and cold packs on the eye and doses of empirium and codeine.

On June 29 or 30, 1959, Harms found that plaintiff's right eye had what he described as "ballooned out" and this would require the removal of the eye before it ruptured. On August 1, 1959, the eye was removed and was replaced with an artificial right eye. Very little vision remained in plaintiff's left eye but he could get around in traffic and read large print in newspapers although he had to use magnifying glasses to read ordinary printing.

The overall record shows that Mamie Yeates, plaintiff's mother, corroborated substantially all of plaintiff's testimony in regard to conversations between plaintiff and Harms, and between plaintiff and the hospital nurse.

Upon timely motions made by counsel for the two defendants the trial court properly admonished the jury when particular testimony was about to be given and struck such testimony as to whichever of the defendants it constituted hearsay with the result that conversations by the plaintiff and his mother with Harms were admitted only as against the doctor and not the hospital. Likewise their testimony regarding conversations with hospital attendants was admitted only as to the hospital and struck as to Harms.

It is undisputed there are eight ophthalmologists in Wichita and Harms is the only one who conducts successive cataract surgery with so short a time elapsing between operations where both eyes are afflicted.

Doctor Jack Dorsey Weaver, who stated he probably did 135 cataract surgeries a year and performed all of them at St. Francis Hospital, testified he knew the standard approved medical practice used by the seven other ophthalmologists in Wichita and similar

communities in performing cataract surgery, including both pre-operative and postoperative treatment. He was also familiar with the standard approved practice of hospitals in Wichita and other communities for the care and treatment of patients who undergo cataract surgery. The operation is serious and dangerous and includes the possibility of infection. If infection is present in the eye by reason of airborne particles or food contamination such as hands or a knife, it will become known in twenty-four to thirty-six hours. Time is very essential in discovering infection so that vigorous treatment can be commenced. Any delay will affect the ability to save the sight of an eye. In determining whether infection is present it is necessary to use the ophthalmoscope. In his practice he informed his patients he thought there was a 99% chance of improvement with approximately a 90% chance of the patient being able to read and do things he had done before, although realizing this is a substitute form of vision. The patient runs approximately a 1% risk of infection or hemorrhage that cannot be controlled.

In Weaver's opinion it would be a departure from the standard in Wichita and similar communities to tell the patient there would be no danger and that he would have 20/20 vision as a result of the operation. Likewise it would be a departure to fail to have a "stand-in" or "call-in" doctor to be contacted in the surgeon's absence from the city.

A long and protracted hypothetical question was asked of Doctor Weaver which contained this particular factual qualification:

". . . the nurse then informed him they could not get in touch with the doctor and he requested that some other doctor be called in, or an interne be called up to see him and she informed him, the nurse, he was informed by the nurse in the hospital, that they could not call in another doctor without the consent and instructions and permission of the doctor who had performed the surgery. . . ."

Weaver's response to the question as to whether, in his opinion, in view of plaintiff's severe pain, Harms' failure to have a stand-in doctor to be contacted departed from the standard in Wichita and similar communities was:

"Certainly the practitioner or the surgeon, or a member of his team, or his firm, or one by arrangements made previously, is usually responsible for call in case of any need."

When asked if it would be a departure on the part of the hospital also, Weaver stated in his opinion it would be.

With regard to Harms performing cataract operations on both eyes within five days of each other, Weaver was then asked whether this would be a departure from the standard and approved medical practice used in Wichita and similar communities, and he stated it departed from the usual standard of procedure in Wichita—*but not in all communities.*

Plaintiff's counsel then asked if it was done in some communities, and Doctor Weaver answered, "Yes, sir," but that it departed from the usual standard in Wichita.

On the question as to whether the hospital or nurse's refusal to call a doctor or interne for plaintiff departed from the standard approved medical procedure used in Wichita hospitals, Weaver further stated:

"I definitely feel that it was not the hospital's nor the nurse's prerogative in any way, to call in a staff doctor. By that I mean one of the—not necessarily the house staff, but one of the other ophthalmologists. *This is not their prerogative.*" (Our italics.)

Doctor George F. Gsell, who was shown to be very well qualified professionally, testified that the mechanics of removing a cataract involve a very, very delicate maneuver even though it is a common operation and has been greatly simplified and improved because of the many advances in all phases of mechanics and medicine. However, when an eye is opened there is potentiality of infection. Depending upon the organism and the resistance of the patient, infection will seldom manifest itself before the third or fourth day or it may go for months. A general statement in regard to this cannot be made.

Gsell denied any knowledge of the procedures of the doctors in cataract operations in Wichita generally except those in the Wichita Clinic where his office is located. In regards to standards, he stated in a very definite manner there may be many circumstances in any individual case where both eyes have cataracts where one might be operated fifteen years later than the other. In another instance the operations might be five days apart, such as here, or two weeks or three months could elapse between the two operations. Then he stated:

"I will guarantee you that there are not two men who had their training in little different places, who do the same procedure and the same technique in cataract surgery."

Mr. William Farmer, practicing attorney in Wichita, testified that he had been plaintiff's attorney in regard to two disability insur-

ance policies. He had discussed plaintiff's eye operations with Harms and three nurses of the defendant hospital. However, his testimony was principally cumulative and is of little help in determining the case before us.

The same is true of the testimony of other witnesses, such as that of the pathologist from the defendant hospital and of certain friends of plaintiff, and we shall not dwell thereon.

It is admitted plaintiff is industrially blind and there has been almost a complete change in his personality.

At the conclusion of plaintiff's evidence, the defendant hospital interposed a general demurrer thereto and also that the evidence failed to establish any actionable or causal connection between any act complained of and alleged to have been performed or failed to have been performed by the defendant hospital which resulted in the injuries claimed by plaintiff.

In sustaining the demurrer the trial court stated, in substance, there was no duty on the hospital, as a matter of law, to call in an interne or another doctor when plaintiff had his own doctor and had seen him a few hours before he complained of severe pain, which doctor was unavailable and had left no "call-in" or "stand-by" doctor, and where there was a telephone in the room and the adult patient and his mother had access thereto.

A similar demurrer interposed by Harms was overruled by the trial court.

The evidence offered by plaintiff above set out has been given the most liberal interpretation possible because it is plaintiff's own interpretation and while it may appear that a great deal of the testimony was admitted over objection of one or the other of the defendants, this is not true because the counter abstracts of defendants show that objections were appropriately lodged with respect to the hospital and sustained by the trial court on the basis that certain questions asked, or to be asked, were not applicable to the hospital. Likewise, all testimony with regard to Harms' statements to plaintiff and Doctor Weaver's testimony relative to the shortness of time between the two operations was stricken as to the hospital. Counsel for plaintiff agreed with the above rulings and stated he would so stipulate.

We are convinced from a careful examination of this record that it fails to show there was any competent, substantial evidence upon which plaintiff's cause of action against the hospital could be predi-

cated unless we infer the hospital, or its agents, servants, and employees, under the existing circumstances, were under a duty to call in another ophthalmologist, staff member, or interne of the hospital and that failure so to do constitutes a violation of such duty. This is a hurdle we cannot make in view of this record.

Plaintiff's evidence by and through Doctor Weaver not only established the fact the hospital had no duty to call in another doctor but also the accepted standard was that the hospital had no prerogative so to do.

This court was faced with a similar situation as to the duty of the hospital in *Goheen v. Graber*, 181 Kan. 107, 309 P. 2d 636, where a mother died during the stillbirth of a child. Authorities cited by plaintiff here in support of his contention were discussed in the Goheen case and it was there said:

". . . negligence is never presumed—it must be established, and until established by competent evidence a jury has no function to perform. Tested by the rules heretofore mentioned with respect to a hospital's liability for negligence and malpractice, plaintiff's evidence not only did not establish negligence—it in fact refuted it." (pp. 114, 115.)

Thus we are compelled to affirm the trial court's order sustaining the demurrer of the defendant hospital.

Doctor Harms testified he always told his patients there was a chance for infection and hemorrhage in cataract operations but he did not mention all the possible risks to a patient because if he did the result would be "both the patient and surgeon would back out." The second operation on plaintiff was performed on June 13, 1959. Harms used his own instruments. He had taken them to the hospital the day before and had separated them for sterilization— the dull instruments were autoclaved and the cutting instruments put into a zephrian solution and remained so during the night. The nurses had started sterilization early the next morning when he arrived. He went to the doctor's room and prepared himself for the operation. The nurse who did the instrument sterilization had started putting drops into the right eye of plaintiff. She put on gloves and scrubbed plaintiff's head and orbit (the eye socket) and around his nose. Harms draped the patient and further prepared the eye for operation. All solutions and equipment used in the latter activity were furnished by the hospital. Harms used his own ampules of liquid anesthetic for injection. There was nothing to indicate the established routine had not been followed—nothing to cause anyone to suspect any infection. The floor nurse called

him about noon the same day reporting plaintiff had a headache and some pain. He ordered fiorinal and demerol medications. Later that same day Harms went to Blackwell, Oklahoma, to perform a cataract operation. He returned to Wichita that evening. He had made no specific arrangements for care of his patients while he was in Blackwell. On June 14, 1959, he looked at plaintiff's eye, using a little pen flashlight, and changed the dressing. On June 15, 1959, around 9:15 a. m. when he removed the dressing from the eye he saw a copious amount of pus on the dressing and ordered chloromycetin.

Harms testified further he did not remember having said that plaintiff had infection in the eye which could only have happened in surgery. He had learned the successive cataract surgery method, which he used, from Doctor Fraley at the University of Michigan School of Medicine. This method was routine procedure where the patient had a limited time and wanted to get back to work as quickly as possible. Harms naturally thought successive cataract surgery as taught and used by Doctor Fraley at the University of Michigan was a good procedure to follow. He knew Doctor Chandler of Boston, Massachusetts, and Doctor Costin of Oklahoma City, Oklahoma, both well-known ophthalmologists, followed the same method. Harms admitted he was aware of the common danger of infection in cataract surgery, that severe pain is one of the indications of infection if the patient's complaints can be evaluated, and loss of the eye through infection is one of the known dangers. His record of previous loss of eyes from infection following surgery was at the rate of one and one half per cent. Harms first suspected infection in plaintiff's eye on June 15, 1959. Before he left for Blackwell he was advised plaintiff was having pain that did not go away. He reiterated that he had discussed the risk of infection and hemorrhage with plaintiff at the outset.

Doctor Albert N. Lemoyne, Jr., ophthalmologist at the University of Kansas Medical Center, examined plaintiff on January 22, 1962, and found a generalized vascular disease in the left eye where a cyst caused a marked distortion of vision plus an area where vision was actually absent. The cyst was related to plaintiff's vascular disease. Were it not for the vascular disease, which was not related to cataract surgery, plaintiff would have good vision in the left eye. There was no reason to believe that infection in the right eye in any way would cause the vascular disease in the left eye.

The trial court instructed the jury, which returned a verdict in favor of defendant Harms. Plaintiff's motion to set aside the order overruling the demurrer and a motion for new trial were both overruled, and thus is presented the remaining potent question before us for appellate review—was there sufficient competent and substantial evidence to support the verdict of the jury in favor of defendant Harms and against the plaintiff?

In addition to the foregoing evidence which, we may mention again, is presented as interpreted by plaintiff, Harms testified that during the few hours he was in Blackwell on June 13, 1959, performing another cataract operation, he had not made any specific arrangements for the care of his patients but it was understood if a nurse wanted him she could check with the physicians' exchange. He had a standing custom that if the exchange could not locate him, it would try to contact his assistant, Doctor Tippen, and if that failed, the call would be held until contact could be made with him.

Harms saw plaintiff the next morning (the 14th) after the Blackwell trip, he removed the eye dressing, pulled down on the lower lid slightly, and examined it with a flashlight. His chart entry showed he dressed the eye, that there was an air bubble low in the anterior chamber, the anterior chamber was well formed and the postoperative condition was good. This was all done in response to a call from one of the nurses who said plaintiff was having pain. Harms was available the rest of the day. When seeing patients he had his own eye tray and performed his own dressings. He prepared his own eye drops but the hospital furnished sterilized pads and "things" that made up the tray. That morning plaintiff had pain at 5:30 a. m. and again at 8:20 a. m. and continued to complain until Harms was notified. Plaintiff was given demerol for pain at 8:50 a. m. and had nothing more until 9:00 p. m. when he received nembutal and demerol. Harms saw him at 9:15 a. m. the following day (the 15th) at which time he discovered the pus on the dressing which definitely indicated intro-ocular infection. Plaintiff said he was allergic to penicillin so Harms gave him a fairly large dosage of chloromycetin and ordered 250 milligrams more to be given every four hours during the night. Harms told plaintiff there was intro-ocular infection but he did not know the cause. He told plaintiff he was going to check with surgery to see if there was any way of checking back on the solutions used during his surgery. He later found the solutions were poured out daily.

His examination of plaintiff's eye the first morning after surgery was as good an examination as Harms felt was safe to make the first day and there was no evidence of infection. The first day after surgery the problem is to minimize the amount of light let in. Otherwise, the patient's reaction is to jerk his head and sneeze and put undue pressure on the eyeball which can cause a ruptured wound.

On Tuesday (the 16th) he examined the left eye for vascular ability. By use of a rather strong cataract lens with a bifocal aid plaintiff was able to read next to the finest print on the eye chart. No notation appeared on his record of any vascular disease in the left eye at that time. Later, on September 24, 1959, Harms again examined the left eye and by use of a cataract lens, plaintiff had 20/20 vision. On April 20, 1960, he had 20/40 minus 1 vision and on an ophthalmoscope examination, the findings were the eye was normal with no finding of vascular disease. Harms, therefore, believed the surgery as to the left eye was satisfactory.

Harms stated he had never been able to determine to his complete satisfaction what caused the infection in plaintiff's right eye. Possibilities were contaminated drapes used in preparing plaintiff for surgery, or the solutions or instruments used during surgery. The patient's condition, the air in the operating room, a sneeze by the patient or any of the operating personnel could all play a part.

Doctor Chandler of Boston, Massachusetts, an ophthalmologist surgeon of great renown, satisfactorily used this procedure in September, 1947. Doctor Tulles Costin of Oklahoma City, Oklahoma, also used this method.

A witness called out of turn, Marriana Smith, testified for Harms. She had married plaintiff on March 27, 1959, and accompanied her husband to see Harms once in June, 1959, before the operation. She stayed with plaintiff every night he was in the hospital with the exception of June 14, 1959. She was present when Harms discovered the infection in the right eye and Harms said it "looked angry." Plaintiff's mother was not present at that time. Marriana had not gone with plaintiff to see Harms in January, 1959. She first went with him to see Harms when arrangements were made for plaintiff to enter the hospital. On June 16 plaintiff felt very uncomfortable and did not get much relief but the most severe pain seemed to be the morning of June 15 and nothing would cause the patient to sleep. Plaintiff knew something was wrong or he felt that something was wrong.

Harms, continuing, further testified he was aware that infection was one of the most common dangers of cataract surgery. The hospital records reflected what was done in surgery. There was no showing that the capsule containing the lens was ruptured. Simple cataracts were the only thing found wrong preoperatively. The most likely time to get infection is forty-eight hours following surgery. Cloudiness or lack of lustre in the cornea and the anterior chamber along with pain would be indicative of infection even though pus had not yet appeared. A culture of the pus might be valuable in determining the origin of the infection, but the eye would be lost before discovery of the type of bacteria to help in the selection of the antibiotic to be used. He gave the antibiotic chloromycetin to plaintiff orally. The fastest result would be achieved by intravenous injection of the antibiotic into the blood stream but that was the most dangerous, the second fastest was by intramuscular injection, and the slowest procedure was orally, but this was the safest. Plaintiff's eye was probably lost forty-eight hours after surgery, or when he discovered the pus. He was advised that plaintiff was having pain that did not go away before he left for Blackwell. The antibiotic he prescribed reduced the infection daily and it could not have been any more effective if a culture had been taken. He had discussed the risk of infection and hemorrhage with plaintiff.

Doctor Lloyd W. Warren, another ophthalmologist in Wichita, testified it was not particularly unusual for a lens to rupture in cataract surgery and this may occur without any error on the surgeon's part. If rupture occurs it is important to remove as much of the soft lens substance as possible without disturbing the hyaloid membrane. Removal of the center portion of the lens capsule provides better vision. A culture should be taken in the event of infection. It would show what infection was present in the external surface but would not indicate what infection was present in the anterior of the eye. Chloromycetin has the capacity to penetrate into the anterior of the eye. It is a drug of choice. Absent vascular disease the patient stands every probability of improvement by removal of the cataract. In advance of surgery it is difficult to determine the extent of vascular changes because of fogginess. It is impossible to visualize the smaller blood vessels through a cataract of even moderate density. Preoperative procedure by the surgeon in this case complied with standard recognized approved practice among surgeons in Wichita and similar communities to

the best of his knowledge. A culture from the eye or an external culture would be a guide to the possibility of the organism on the inside. The presence of vascular disease does not offer the patient as much vision as if it were not there, and where ascertainable, the patient should be advised thereof. At least two or three weeks following the operation, vascular disease, if present, can be seen.

On June 14, 1959, Mary Vena Siggs, a registered nurse, was in charge of the third floor in St. Francis Hospital, and she testified that she called Harms and on his order she administered "75 demerol" at 8:50. She knew of no further complaint from plaintiff up until the time she went off duty at 3:30 p. m. Plaintiff's wife would pat him on his face and cheek. After eye surgery the nurses have nothing to do with the patient's face. In order to avoid damage to the eye, they do not wash the patient's face, comb his hair, or do anything of that nature until the doctor says to do so.

Helen Betty Barth, the nurse in charge from 11:00 p. m. to 7:00 a. m., had a relief nurse on the night after surgery. However, plaintiff's chart showed "sleeping" after midnight, and at 5:30 a. m. showed "Demerol 75 milligrams. . . . A good post-operative night." In the early morning of the fifteenth Miss Barth returned and charted plaintiff to have been sleeping and to have had a good night. She reported no complaints and administered nothing. She had orders from Harms to give plaintiff pain-relieving medicine if he complained, but he did not complain.

Harriet Williams, another nurse, testified that on the day of surgery she gave the plaintiff 75 milligrams of demerol. She had been ordered to administer the demerol closer in time than it was ordinarily given.

The trial court gave eighteen instructions exclusive of the pleading instruction, twelve of which were "stock" instructions and six particularly applicable to the facts and circumstances of this case.

While all instructions given are reflected in the record, and properly so, we are not going to reiterate them here because that will only extend the opinion unnecessarily.

The principal objection made by plaintiff to the instructions given by the court and judging from the three requested instructions he submitted is that plaintiff would have this court eliminate from the general rule that has been recognized in malpractice cases over a long period of time the words, ". . . *or similar communities.*" (Our italics.) As may occasionally occur, some cases have not required, and therefore, the opinions of this court have not fully

stated the general rule (*Natanson v. Kline*, 186 K. 393, 399, 350 P. 2d 1093) but when it has been a decisive factor in a lawsuit, the court has always been careful to re-pronounce our cardinal rule that it is presumed a physician or surgeon possesses and will use that reasonable degree of learning and skill ordinarily possessed by members of his profession and of his school of medicine in the community where he practices, *or similar communities*. (*Cummins v. Donley*, 173 Kan. 463, 465, 249 P. 2d 695; *Goheen v. Graber*, 181 Kan. 107, 111, 112, 309 P. 2d 636; *Voss v. Bridwell*, 188 Kan. 643, 652, 364 P. 2d 955; 7A West's Kansas Digest, Physicians & Surgeons, § 14, pp. 618, 619; 4 Hatcher's Kansas Digest, rev. ed., Physicians & Surgeons, § 7, p. 410.) Our conclusion is the trial court did not err in including the phrase "or similar communities" in its theory of the case through the instructions given.

Instruction No. 12 given by the court reads:

"You are further instructed that the present condition of the left eye of Tom Miller Yeates is not the result of the cataract surgery performed by Dr. Harms in June, 1959; and in awarding damages, if any, you are not to consider such impairment of vision of said left eye. You may, however, in the event that you find for the plaintiff, consider the present condition of the left eye in awarding damages for the loss of the right eye."

We believe the above instruction was proper as to both elements under the circumstances of this case and the overall record, that is, any impairment of vision in plaintiff's left eye could not be a result of the cataract surgery but the jury could properly consider the present condition of the left eye if it found plaintiff was entitled to damages for the loss of the right eye. Thus we conclude the trial court was correct in overruling plaintiff's objection thereto.

A careful examination of plaintiff's requested instructions reveals that in his concept of the case he goes too far and would have this court extend the duty of a physician or surgeon to the extreme where he would have to apprise his patient not only of the known risks but also of each infinitesimal, imaginative, or speculative element that would go into making up such risks. This is another hurdle we simply cannot make. Here we are faced with a record that does not disclose any competent, substantial evidence as to the *actual cause* of infection in plaintiff's right eye, and we cannot indulge in conjecture on this pivotal point. Another reason to believe the requested instructions were improper is that while all the evidence introduced in this case was contradicted, the jury apparently was not convinced by plaintiff's evidence, and by its general verdict for

defendant, the jury thereby resolved all such contradicted evidence in favor of defendant.

In order to recover in this malpractice case, the burden of proof rested upon plaintiff to show that Harms committed one or more acts of negligence (*Natanson v. Kline,* 187 Kan. 186, 190, 354 P. 2d 670) and, as stated above, inherent in the general verdict is the fact that plaintiff did not prove such negligence to the satisfaction of the jury.

Our attention is directed to *Harris v. Exon,* 161 Kan. 582, 170 P. 2d 827, but that case is not applicable here because it turned solely on the orders of the trial court overruling a demurrer to the evidence and a later motion for a directed verdict where the requirements of proof are entirely different.

We have been unable to find in this appeal any error on the part of the trial court which prejudicially affected the substantial rights of plaintiff and thus we affirm the judgment of the trial court in all respects complained of.

Judgment affirmed.

FONTRON, J., concurs in the result.