No. 45,112

BEN C. AVEY, *Appellant*, v. ST. FRANCIS HOSPITAL AND SCHOOL OF NURSING, INC., *Appellee.*

(442 P. 2d 1013)

Opinion filed July 13, 1968.

*John C. Frank*, of Wichita, argued the cause, and *Patrick F. Kelly*, *Ward V. Lawrence*, and *Eugene B. Ralston*, all of Wichita, were with him on the briefs for the appellant.

*J. Francis Hesse*, of Wichita, argued the cause, and *Harry L. Hobson*, of Wichita, was with him on the briefs for the appellee.

The opinion of the court was delivered by

KAUL, J.: This action was brought by Ben C. Avey, plaintiff-appellant, to recover damages allegedly caused by the negligence of the St. Francis Hospital and School of Nursing, Inc., defendant-appellee, in the furnishing of hospital services.

Plaintiff has appealed from a judgment entered on a jury's verdict for defendant in the court below. Errors specified on appeal concern instructions and the trial court's refusal to admit evidence offered by plaintiff.

Plaintiff was a resident of Cherryvale. His troubles involved in this litigation commenced when he first suffered some mental illness in 1961. He was hospitalized and treated in a psychiatric center in Kansas City. After treatment his condition improved and he returned home. In 1962 he suffered a reoccurrence of the same mental symptoms, consisting of nervousness, worry, imaginary illness and insomnia. His family consulted Dr. Fred Gasser of Cherryvale who recommended that plaintiff be sent to defendant hospital in Wichita for treatment. Arrangements were made to enter plaintiff in defendant hospital where he became a patient of Dr. Poling, a Wichita psychiatrist. Plaintiff was admitted to the psychiatric section of the hospital on July 6, 1962. He was examined by Dr. Poling who told plaintiff's family that he wanted to observe plaintiff for four or five days and the family should return to Wichita on July 10.

On July 10 plaintiff's wife, and his daughter and her husband, returned to Wichita and conferred with Dr. Poling, in the presence of a hospital nurse from the psychiatric section. Dr. Poling informed the family that plaintiff was suffering from involutional depression and would probably need electric shock treatments. Dr. Poling also told the family that plaintiff was suffering from a prostate condition. Arrangements were made to correct this condition by a transurethral resection to be performed by Dr. Browning, a surgeon attached to the staff of defendant.

Plaintiff was transferred from the psychiatric ward to room 323 of the surgical ward for purposes of surgery. Plaintiff was operated the morning of July 13. Dr. Browning requested that a member of the family stay all night with plaintiff. The family stayed in Wichita, and some member was with plaintiff in room 323 until July 15. Plaintiff's daughter, Mrs. Johnson, testified that when they

were ready to leave the hospital she went to the nurses station for that floor and told the registered nurse in charge they were going home. Mrs. Johnson further testified that she told the nurse her father was quite confused and for them to watch him and keep the bed rails up that they were afraid, that because of his confused condition, he might fall out of bed. The nurse told Mrs. Johnson, and her husband, to be assured they would watch plaintiff and not to worry everything would be all right.

At 5:10 a. m. on July 18 plaintiff was found on the roof of the emergency tunnel, directly below a window of the bathroom which plaintiff was using. He had been given bathroom privileges the day before. There is a conflict in the opinion testimony as to whether plaintiff intentionally jumped or accidentally fell from the window.

The hospital records disclose that on July 17 plaintiff was given tace; demerol, which is a narcotic; phenergan, a sedative; and noctec, a sedative or hypnotic. Nurse Bertha Turley was in charge of the surgical ward until 11 p. m. on the evening of July 17. At 9 p. m. nurse Turley gave plaintiff noctec, demerol and phenergan all at the same time. She testified that these three drugs had never been given to plaintiff at the same time before. She further testified that medical orders have to be stopped by the doctors, and if the doctors do not discontinue medical orders she continues giving the medicines called for in the orders. Nurse Turley further testified that she did not know much about psychiatry or the tendencies of involutional depressive patients. She testified that she did not advise the nurse replacing her at 11 p. m. of plaintiff's condition. At 11 p. m. on July 17 nurse Turley was replaced by nurse Helen Barth, a registered nurse, who had just returned from vacation. Nurse Barth had not seen plaintiff prior to that time, she had not had any experience in the care or treatment of psychiatric patients, nor had she received any special instructions concerning plaintiff's condition. She testified that she saw plaintiff go to the bathroom and watched him go to the water fountain, but she did not visit him in his room. Nurse Barth was the last person to see plaintiff prior to his fall or leap.

Plaintiff sustained serious injuries as a result of his leap or fall, including several fractured bones. Subsequently, plaintiff was treated by Dr. Robert Tinker, an orthopedic surgeon, who testified concerning plaintiff's injuries. Dr. Tinker continued treating plaintiff until his release from the hospital on September 29, 1962.

The error, most emphatically urged by plaintiff, on appeal is the trial court's refusal to admit the testimony of Dr. Robert B. Stein, by which plaintiff attempted to establish the negligence of defendant and the degree of nursing care owed plaintiff under the circumstances. Dr. Stein's testimony was objected to on the grounds that he had not practiced in the Wichita community. The objection was sustained. We find no contention by defendant in the record that Dr. Stein was not otherwise qualified as an expert witness. After defendant's objection was sustained by the trial court, plaintiff proffered Dr. Stein's testimony in its entirety, and the full text thereof is included in the record on appeal.

Dr. Stein was graduated from New York College of Medicine. He interned at Cincinnati General Hospital, served as a medical officer in the United States Army and Navy, and served as a flight surgeon at a Navy Air Station in Massachusetts. He had three years of residency at the Menninger School of Psychiatry; was a resident at the Veterans Administration Hospital in Topeka, served as a staff physician at the Menninger Memorial Hospital, and as a faculty member of the Menninger School of Psychiatry. He is presently attached to the North Central Kansas Guidance Center at Manhattan. He is licensed to practice medicine and surgery in Kansas, Massachusetts and California, and is certified by the American Board of Psychiatry and Neurology. Dr. Stein testified that he was a member of various other medical and psychiatric associations. His testimony is further narrated in the record:

". . . He has reviewed copies of the records of the St. Francis Hospital, records of Mr. Ben Avey; he has read the St. Francis School of Nursing Manual. Counsel objected to the reference of the manual. Court sustained the objection. He has read and is familiar with the Standards for Hospital Accreditation by the Joint Commission of Accreditation of Hospitals. He is familiar and has read the state laws as set down by the Kansas State Board of Health on hospital regulations; he has read the St. Francis Hospital and School of Nursing Psychiatric Manual, the textbook 'Psychiatric Nursing.' He is familiar with the psychiatric section policies and working relations of the St. Francis Hospital. He is familiar with the By-Laws and Rules of the Medical and Dental Staff of the St. Francis Hospital; he was given the original hospital records of the St. Francis Hospital of the plaintiff, Mr. Ben Avey, and said there was no physical examination of Mr. Avey in the records. . . ."

. . . . . . . . . . . . . . .

". . . The next question to the doctor was 'Are you familiar with St. Francis Hospital.' He answered that he was. That he had been in St. Francis Hospital and that he had talked with members of the staff of St. Francis Hospital. He said he was personally friendly with 7 of the psychiatrists of the

staff of St. Francis Hospital; Dr. Carter Neussen, Dr. Austin Adams, Dr. Ronald Erken, Dr. Charles Wellshear, Dr. Robert Kitchen, Dr. Edmond St. Felix and Dr. Alfred Heasty. The last communication he had with a member of the staff of St. Francis Hospital was this morning when I talked with Dr. Wellshear. . . ."

Dr. Stein was then asked a hypothetical question, framed within what we believe to be a fair representation of plaintiff's condition and described the circumstances surrounding his hospitalization and medication, followed by questions and answers set out in the record as follows:

". . . Now, doctor, assuming that to be true, do you know what the standard of care generally in this community would be for nurses for a man under the conditions that I have just described to you? His answer: 'Yes sir, I do.' He was asked to give it and it was objected to by counsel for the defendant on the grounds that he wasn't qualified to speak with reference to the standard of care of hospitals in this community, and the court sustained the objection. Next Question: 'Doctor, would the standard of care in Wichita, Topeka, or Kansas City, or any hospital be the same for this type of care under the conditions that I have just described to you.' Answer: 'Yes;' which was objected to by counsel for the defense and was sustained by the court and the answer was stricken from the record.

From the record it appears Dr. Stein's testimony was refused by the trial court for the sole reason that he had not actually practiced in the City of Wichita, even though he stated he was familiar with defendant hospital itself and with nursing care generally in the community.

Plaintiff argues that Dr. Stein was sufficiently qualified as an expert, that he had the required knowledge of standards of care in the Wichita community and that it was reversible error to refuse his testimony as an expert.

The defendant, on the other hand, argues that Dr. Stein could not possibly be familiar with hospital practices and nursing procedures in general hospitals in the community of Wichita since he had not practiced in that city. Defendant further states in its brief that hospital care in Wichita might be substantially different from the standard of care in Manhattan or Topeka.

While defendant cites no cases in its brief on this point, we gather from its argument that it relies on the application of what has often been called the "locality" or "community" rule in the establishing of the standards of medical or hospital care and the qualifications of an expert witness to testify as to such standards. It must be conceded that language used by this court in a number

of cases, dealing with the subject, lends some support to the position taken by defendant. The cases referred to will be discussed in the course of this opinion. For our purposes at this juncture, Dr. Stein was presented as a witness, who claimed to know the standards of hospital and nursing care in Wichita, and supported his claim by a reasonable explanation as to how such knowledge was acquired.

From this setting the question is framed: May an expert, otherwise fully qualified and claiming to know the hospital practices and nursing procedures of a community, be permitted to testify as to such matters when he has not actually practiced medicine in such community?

Dr. Stein testified that he was familiar with defendant hospital itself, that he was familiar with general hospitals having psychiatric sections in Topeka, as well as other cities in Kansas, and that there was no difference in the standard of care of these various hospitals toward a patient such as plaintiff; that he had been on seminar programs with physicians from the Wichita area, and they had described to him in detail the in-hospital facilities of defendant and its psychiatric units; and that the standards of care, as described by staff members of defendant, would not be different from any place in the State of Kansas.

In view of our disposition of this appeal, we believe it is unnecessary to recite in further detail the testimony of Dr. Stein and that of defendant's witnesses with respect to the alleged grounds of negligence. It is sufficient to say that Dr. Stein's testimony substantially differed from that of defendant's experts with respect to the duty of defendant concerning the transfer of a patient from the psychiatric section to the surgical ward, and as to the care and control required in the administering of drugs and narcotics under the circumstances shown.

The test of the competency of an expert witness is whether he discloses sufficient knowledge of his subject to entitle his opinion to go to the jury. (K. S. A. 60-419 and 60-456; *Casey v. Phillips Pipeline Co.,* 199 Kan. 538, 431 P. 2d 518.)

We believe Dr. Stein should have been permitted to testify. The weight or credibility of his testimony and whether or not he actually knew the practices and nursing procedures of defendant, as he claimed, were matters for the consideration of the jury. As we are able to glean from the record presented, the purpose of plaintiff

in offering the testimony of Dr. Stein was to present evidence as to hospital practices and nursing procedures in Wichita, not in Manhattan, Topeka, or Kansas City, even though Dr. Stein testified that standards of care were the same in all of these communities. In other words, we hold that an expert, otherwise qualified, who claims to know the standards of hospitals and nursing care in the community concerned and where his claim of knowledge is supported by testimony, such as reflected in the record here, may testify even though he has not actually resided or practiced in the community in question.

K. S. A. 60-456 relates to expert and other opinion testimony. Subsection (*b*) reads:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

Under the statute quoted an expert witness is required to base his testimony upon facts personally perceived by or known to him or made known to him at the hearing, within the scope of the special knowledge and experience of the witness. In this case the subject matter was clearly within the special knowledge of Dr. Stein. We believe his testimony disclosed sufficient knowledge of hospital practices and nursing procedures in Wichita and that his explanation of how he acquired such knowledge was sufficient to entitle his opinion to go to the jury. As we have indicated, the degree of his knowledge goes more to the weight of his testimony than to its admissibility. In *Casey v. Phillips Pipeline Co.*, supra, we held:

"Pursuant to K. S. A. 60-419 and 60-456, the test of competency of an expert witness is whether he discloses sufficient knowledge to entitle his opinion to go to the jury. Where an expert witness has disclosed a sufficient knowledge of the subject to entitle his opinion to go to the jury the question of degree of his knowledge goes more to the weight of the evidence than to admissibility." (Syl. ¶ 2.)

We are cognizant of the well established rule of this jurisdiction that the qualifications of a witness to testify as an expert on a particular subject are generally for determination in the reasonable discretion of the trial court. The discretion, when exercised by the trial court, is not subject to review unless an error of law has been committed or such discretion abused. (*Taylor v. Maxwell*, 197 Kan.

509, 419 P. 2d 822; *Grohusky v. Atlas Assurance Co.*, 195 Kan. 626, 408 P. 2d 697.) However, in view of the knowledge relevant to the subject matter of this case, as testified to by Dr. Stein under the circumstances related, we believe it was error to exclude his testimony.

We believe a jury will be sufficiently informed to judge the extent of an expert's qualifications and to decide how much credence should be given to his testimony when properly instructed in accordance with the views expressed.

While what has been said requires the granting of a new trial, we believe several other points raised on appeal should have attention.

Since Dr. Stein's testimony, that the type of care under the conditions prevailing in this case, would be the same in a hospital in Wichita, Topeka or Kansas City was also excluded, over plaintiff's objection, we believe some further discussion of the application of the so-called "locality" or "community" rule in this jurisdiction is required. The question presented on this point essentially involves the same issue raised by plaintiff's objection to the instruction given as to the duty of care owed by defendant.

Instruction No. 12 reads in pertinent part as follows:

"You are further instructed that the hospital owed a duty to Ben C. Avey to exercise that degree of care, skill, and diligence used by hospitals generally *in this community* under the circumstances existing at the time.

"The degree of care exacted in private institutions toward their patients is such reasonable care and attention for their safety as their mental and physical condition, if known, may require and should be in proportion to the physical or mental ailments of the patient rendering him unable to look after his own safety.

"On the other hand, the hospital was not an insurer of Mr. Avey's safety, and it was not required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate is likely to happen." (Emphasis supplied.)

Plaintiff strenuously argues that the instruction given was too restrictive, that as a practical matter the phrase "in this community" restricted the measurement of defendant's duty to the boundaries of the City of Wichita.

Plaintiff contends the trial court should have further explained to the jury the meaning of the term "community." Plaintiff cites the case of *James v. Grigsby*, 114 Kan. 627, 220 Pac. 267, a medical malpractice suit where this court, in applying locality as related to the duty of a physician or surgeon to his patient, used the language "in the community where he practices or similar communities."

Plaintiff submits that all hospitals in this state are subject to the provisions of the hospital licensing law, K. S. A. 65-401 to 441. This act provides for the licensing, inspection and regulation of hospitals in this state and authorizes the promulgation of rules and regulations and provides for the enforcement thereof. The State Board of Health Regulations, effective October 1, 1958 [4th Ed.], and in effect until readopted January 1, 1966, now appearing as K. A. R. 28, was received in evidence in this case.

Plaintiff also suggests that since defendant is accredited by the joint commission on accreditation of hospitals the term "community" rises to that community of hospitals accredited by the joint commission. The joint commission of accreditation of hospitals is a commission comprised of the American College of Physicians, the American College of Surgeons, the American Hospital Association, and the American Medical Association. The standards for hospital accreditation, published by the joint commission, were also received in evidence.

Plaintiff has directed our attention to recent decisions of other jurisdictions in which qualified persons were permitted to testify concerning customary standards and practices of accredited hospitals, irrespective of the city or community in which such hospitals are located, and in which instructions were approved authorizing the jury's consideration of hospital licensing acts and standards of the joint commission on accreditation. (See *Duling v. Sanitarium,* 149 W. Va. 567, 142 S. E. 2d 754, and *Darling II v. Charleston Memorial Hospital,* 50 Ill. App. 2d 253, 200 N. E. 2d 149.)

The position taken by plaintiff requires some review of Kansas cases in which the community rule has been considered regarding the standards of care required of a hospital and cases analogous in many respects dealing with the application of the rule to medical malpractice pertaining to physicians and surgeons.

The locality rule is generally acknowledged to have stemmed from the case of *Small v. Howard,* 128 Mass. 131, decided in 1880. The rule requires the standard of professional medical care and skill of a defendant physician in a malpractice suit to be measured by the professional care and skill ordinarily possessed by others in his profession in the community. The rationale of *Small* was to protect a rural physician from having his skill measured by the standards of doctors practicing in larger cities. The rule in *Small* was widely accepted and followed in many jurisdictions.

Recently the rule was abrogated by the court which promulgated it (*Brun v. Belinkoff,* _____ Mass. _____, 235 N. E. 2d 793) and either modified or rejected in a number of other jurisdictions (Louisell and Williams on Trial of Medical Malpractice Cases, 1966 Supp. ¶ 8.06).

Even before the decision in *Small,* the Kansas court in 1870 recognized the need for some distinction as to the standards of skill required of a rural physician and one practicing in a metropolitan area. (*Erastus Tefft v. Hardin H. Wilcox,* 6 Kan. 46.) In essence, the principles first enunciated in *Tefft* have been recognized by this court down through the years. (7A West's Kansas Digest, Physicians & Surgeons, § 14; 4 Hatcher's Kansas Digest, rev. ed., Physicians & Surgeons, § 7.) In medical malpractice cases concerning physicians and surgeons the rule stated usually included the phrase "*or similar communities.*"

The phrase "*or similar communities,*" in addition to *James v. Grigsby,* supra, is included in the rule stated in *Cummins v. Donley,* 173 Kan. 463, 465, 249 P. 2d 695; *Goheen v. Graber,* 181 Kan. 107, 111, 112, 309 P. 2d 636; *Voss v. Bridwell,* 188 Kan. 643, 652, 364 P. 2d 955. In some cases the circumstances have not required the rule to be fully stated, probably because no evidence was offered relative to "*similar communities.*" The omission of the phrase from the rule, as stated in some cases, is noted and explained in *Yeates v. Harms,* 193 Kan. 320, 393 P. 2d 982. In this medical malpractice action plaintiff objected to the inclusion of the words "*or similar communities,*" in the court's instruction. In considering the point on review this court concluded the trial court did not err in including the phrase and stated:

". . . As may occasionally occur, some cases have not required, and therefore, the opinions of this court have not fully stated the general rule (*Natanson v. Kline,* 186 Kan. 393, 399, 350 P. 2d 1093) but when it has been a decisive factor in a lawsuit, the court has always been careful to re-pronounce our cardinal rule that it is presumed a physician or surgeon possesses and will use that reasonable degree of learning and skill ordinarily possessed by members of his profession and of his school of medicine in the community where he practices, *or similar communities.* . . ." (pp. 332, 333.)

It is quite clear from a review of the cases cited that this court, by including the phrase "*or similar communities,*" has not given the restrictive application to the locality rule, such as was applied in some jurisdictions, in medical malpractice cases.

It must be borne in mind, the case at hand involves the standards of care with respect to hospitals as distinguished from that required of a physician in a medical malpractice action. However, the application of locality or community is analogous in many respects to both types of cases and is relevant to the qualification of an expert witness and the standards of care, required in actions based on the negligence of either a physician or hospital or both. With respect to the care required of a hospital, we find the words *"in the community"* or *"in that community"* used and the phrase *"or similar communities"* omitted, contrary to the rule as stated in medical malpractice cases.

In *Goheen v. Graber,* supra, it is held:

"A private hospital is bound to exercise toward a patient such reasonable care as his known condition may require, the degree of care being in proportion to his known physical and mental ailments. The extent and character of the care that a hospital owes its patients depends upon the circumstances of the particular case, and the measure of duty of a hospital is to exercise that degree of care, skill and diligence used by hospitals generally in the community and required by the express or implied contract of the undertaking." (Syl. ¶ 3.)

The rule quoted is in harmony with statements in *Noel v. Menninger Foundation,* 180 Kan. 23, 299 P. 2d 38, and *Marks v. St. Francis Hospital & School of Nursing,* 179 Kan. 268, 294 P. 2d 258. We are cited to no case and our research reveals none in this jurisdiction, based on a hospital's negligence, where the omission of the phrase *"or similar communities"* was at issue. Whether this results from the lack of any attempt to introduce evidence pertaining to similar communities is not reflected in the opinions referred to. If all of the evidence offered by either party in an action pertains only to standards of care in the community where the alleged malpractice or negligence occurred, then, of course, the phrase *"or similar communities"* would be immaterial and there would be no need for its inclusion in an instruction or in stating the rule, as was explained with reference to physicians in *Yeates v. Harms,* supra. It appears then that this court is confronted for the first time with the proposition as to whether the rule with respect to hospital care includes measurements by standards of care in similar communities, under like circumstances of the case involved.

In our judgment the need for emphasis on locality no longer exists. Even though in some cases allowances must be made in defining similar localities by the recognition of such factors as popu-

lation, the availability of medical facilities, medical equipment, etc., we believe the knowledge of similar conditions is the essential element rather than geographical proximity. We do not mean to say that the nature of the locality of a hospital may be totally disregarded but in our judgment geographic proximity is only one factor to be considered in determining similarity.

The standardization of hospital and nursing procedures, brought about by the Kansas statutes, regulations promulgated thereunder, and the standards of the joint commission on hospital accreditation, serve to deemphasize the strict application of geographic locality. The standards, and regulations referred to, recognize in many instances the differences in hospitals with respect to size and services offered.

We hold, therefore, that, where a proper foundation of knowledge of similarity of conditions is established, the testimony of an otherwise qualified expert is admissible as evidence, tending to show the standards of care required of a hospital in a similar community involving a case under like circumstances. Where such evidence has been received, an instruction should be extended accordingly to include the phrase *"or similar communities."* In other respects we believe the instruction quoted fairly states the duty of a hospital in this jurisdiction. See PIK 15.02 and authorities cited in the comment in connection therewith.

We turn next to other points which we believe deserve attention at this juncture of the litigation.

Plaintiff contends the jury was confused by the court's instruction pertaining to third party negligence. It reads as follows:

"If you find the injuries and damages of which plaintiff complains were caused by the negligence of a third party or parties, including any member of the medical staff of the defendant, you should return a verdict for the defendant."

While the jury was deliberating, the following query was presented to the court:

"Please interpret:

"If you find that the injuries and damages of which plaintiff complains were caused by the negligence of a third party or parties

"Does this mean that any degree of negligence by a third party or parties, however small, means that the decision must be made for the defendant?"

The court refused to answer the query and merely instructed the jury to reread the instructions.

It is apparent the jury was confused by the court's failure to fully instruct with respect to the effect of concurrent or sole negligence of a third party or parties. From this record it appears the defense was that negligence, if any existed, was solely that of attending physicians for which defendant was not liable. Apparently, it was plaintiff's theory that even though there may have been negligence on the part of attending physicians, there was also negligence on the part of defendant which caused plaintiff's injury. Under the evidence and the theory on which this case was tried, as portrayed in the record, the jury should have been more fully instructed on this point. Liability in tort may flow from joint and concurrent acts of negligence on the part of two or more persons (*Cassity v. Brady,* 182 Kan. 381, 321 P. 2d 171), and may render all liable as joint tortfeasors when the acts of each contribute to the injury and, in such circumstances, the degree of culpability of each is immaterial and each is liable for the entire damage. (*Tilden v. Ash,* 145 Kan. 909, 67 P. 2d 614, and *Kreh v. Trinkle,* 185 Kan. 329, 343 P. 2d 213.) The concurrent negligence of another does not relieve one whose negligence was the proximate cause of an injury. (*Applegate v. Home Oil Co.,* 182 Kan. 655, 324 P. 2d 203. See, also, PIK 5.02.)

A party is entitled to an instruction which is essential to his theory of the case when there is sufficient evidence to support such theory. (*Kreh v. Trinkle,* supra.)

One further matter deserves our brief attention. Plaintiff strenuously urges error with respect to the trial court's instruction relating to contributory negligence. The instruction given stated the standard rule with respect to contributory negligence and held plaintiff accountable for that degree of care required of a reasonable prudent person. Plaintiff argues that in view of the evidence showing plaintiff to be a mentally ill and confused person, the court's failure to consider mental capacity as a factor in instructing as to plaintiff's duty of care with respect to contributory negligence was prejudicial error.

Paragraph 2 of instruction 12, quoted before, encompasses mental or physical incapacity of a patient as a factor in defining a hospital's duty and is a correct statement of law. The court's instruction on contributory negligence is inconsistent with the instruction referred to and would tend to confuse a jury.

From the record it is apparent that reasonable minds might differ in this case upon the question of plaintiff's accountability for his own

actions. This question is one of fact for the jury's determination and should have been submitted for the jury's consideration in determining the issue of contributory negligence.

This court has recognized that the mental condition of a person, so far as his incapacity is known to the person charged with a duty of care, must be given weight in determining whether a person thus deficient has been guilty of contributory negligence, and when warranted by the evidence, mental condition is a factor to be considered by the jury on the issue of contributory negligence. (*Noel v. McCaig*, 174 Kan. 677, 258 P. 2d 234; 38 Am. Jur., Negligence, § 201, pp. 882, 883.) ·

Since this case is to be tried again, we shall refrain from ruling on other specifications of error, as they may not arise in the new trial.

The judgment is reversed with directions to grant a new trial.