No. 43,330

Kenneth L. Kohler and Eva M. Kohler, *Appellees*, v. The Kansas Power and Light Company, a Corporation, *Appellant.*

(387 P. 2d 149)

Opinion filed December 7, 1963.

*Charles S. Fisher, Jr.,* of Topeka, argued the cause, and *O. B. Eidson, Philip H. Lewis, James W. Porter, Peter F. Caldwell, William G. Haynes, Roscoe E. Long, Harry W. Colmery, Robert E. Russell* and *Lawrence D. Munns,* all of Topeka, were with him on the briefs for appellant.

*David H. Heilman,* of Council Grove, argued the cause and was on the briefs for the appellees.

The opinion of the court was delivered by

Fatzer, J.: This was an action to recover actual and punitive damages to the residence and property of the plaintiffs as a result of the electrical current being shut off by the defendant, causing frozen meat to spoil. The jury returned a verdict in favor of the plaintiffs in the amount of $6,060.45 actual damages, and awarded them punitive damages in the sum of $4,000.

The sole question presented is whether plaintiffs' evidence was sufficient to support the jury's verdict awarding punitive damages. There was little dispute as to the facts, and they are briefly summarized: The plaintiffs are husband and wife and reside in White City, and are the parents of two minor children, Charles, age 12 years, and Kenneth, age eight years. The defendant, The Kansas Power and Light Company, had furnished electrical current to the plaintiffs' home for approximately five years prior to July 18, 1960. The minor child, Kenneth, had rheumatic fever and his doctor recommended that he be moved to a higher and dryer climate during the summer vacation. The Kohler family left White City on June 20, 1960, for Albuquerque, New Mexico, to spend the summer and return prior to the commencement of school in the fall. Before leaving White City, Mr. Kohler went to the office of the

defendant in White City to pay his June bill and while he was there he informed two of its employees that his family was leaving for the summer; that he did not want his electrical current shut off, and to bill him monthly at Albuquerque for the service. The plaintiffs left all their furniture, winter clothing, household effects and appliances in their home, taking with them only their clothing for the summer. Among the appliances in the home were a deep freeze and a refrigerator with a freezing compartment, which contained approximately 460 pounds of processed meat.

George Griffiths, the managing agent and an employee of the defendant out of its White City office, had been in the Kohler residence in March, 1960, to install a meter to determine how much electrical current the deep freeze used. The meter was left installed for about two weeks and was removed at plaintiffs' request.

White City is a town of approximately 500 people and Griffiths had lived there for approximately 25 years. He was personally acquainted with the Kohlers and knew they were leaving White City for the summer for their minor son's health. He was also acquainted with and knew the parents of Mr. Kohler, who lived less than a block from the plaintiffs' residence. The evening prior to their leaving, Griffiths saw the plaintiffs loading their trailer preparatory to their departure.

While in Albuquerque, the plaintiffs received a bill for electrical current which had been used in their residence and they remitted payment for the charge. At no time were they delinquent for payment of the electrical service.

On or about July 18, Griffiths, while reading meters for the defendant, disconnected the electrical current to the Kohler residence at the time he was reading the meter for the service to their home. When he read the meter he noticed that the Kohlers had used approximately 180 Kilowatts and he knew that when they were living in the residence their average monthly reading was between 200 and 230 kilowatts. Neither before nor after Griffiths disconnected the electrical current did he make an attempt to contact Kohler's parents or other relatives who lived in White City.

During the time the plaintiffs were in Albuquerque their house was completely closed. The electrical current was cut off during the hot summer, which caused 460 pounds of processed meat in the deep freeze and refrigerator to become decomposed and rotten, causing the refrigerator and deep freeze doors to burst open and

blood, meat, and the contents to run out and upon the floors of the residence. The decomposed meat created an excruciating odor which penetrated the walls of the home, the furniture, appliances, clothing and other household effects.

On or about August 4, 1960, Mr. Kohler's parents checked on the plaintiffs' residence and discovered the terrible condition existing in the home. Kohler's father called Griffiths and asked if he had disconnected the electrical service, and he said he had. Kohler's father told him that the plaintiffs had frozen meat in the house. Griffiths came to the plaintiffs' residence immediately and he could smell the decomposed meat before he and the plaintiff's father got the door open. The meat was completely decomposed. He emptied the freezer into a wash tub and a bucket and carried them out and loaded them onto his truck and took them to the city dump. Efforts were made to clean and disinfect the residence by the use of formaldehyde and other disinfectants, but to no avail. Griffiths wrote the plaintiffs in New Mexico, stating in part:

"I remember we had some conversation about the electricity before you left but I sure don't remember you telling me you had a freezer of meat in the house . . . I evidentally misunderstood you, I am sure you did not tell me to shut off the current when you had your freezer loaded."

The defendant argues that the evidence is insufficient to support the jury's verdict for punitive damages which was approved by the district court. We do not agree. In the early case of *Telegraph Co. v. Lawson,* 66 Kan. 660, 72 Pac. 283, with citation of numerous cases, it was said:

". . . The rule is too well settled in this state to admit of modification or change, that in all actions to recover damages for negligence, where actual damages are recoverable, the plaintiff is entitled to recover exemplary damages if the negligence be so gross as to amount to wantonness. (Cases cited.) The term 'wantonness' as here used does not necessarily mean malice, but a reckless disregard of the rights of others." (1. c. 662, 663.)

In *Allman v. Bird,* 186 Kan. 802, 353 P. 2d 216, rules relating to the allowance of punitive damages, the purposes for which they are allowed, and the conditions and circumstances under which they may be recovered, were discussed and applied, and in the opinion it was said:

". . . this court has held that generally the intentional doing of a wrongful act with full knowledge of its character, and without cause or excuse, is malicious and warrants an award of exemplary damages. (Cases cited.)" (1. c. 806.)

In *Frazier v. Cities Service Oil Co.,* 159 Kan. 655, 157 P. 2d 822, in defining gross and wanton negligence, it was held:

"To constitute wantonness, the acts complained of must show not simply lack of due care, but that the actor must be deemed to have realized the imminence of injury to others from his acts and to have refrained from taking steps to prevent the injury because indifferent to whether it occurred or not. If the actor has reason to believe his act may injure another, and does it being indifferent to whether it does or not, he is guilty of wanton conduct." (Syl. ¶ 5.)

In *Watkins v. Layton,* 182 Kan. 702, 324 P. 2d 130, the rule relating to the sufficiency of proof of punitive damages was stated, and we held:

"The law does not require a specific finding of an intentional and ruthless desire to injure in order to sustain an award of punitive damages. The burden of proof is sustained, once the injured party shows such gross neglect of duty by the wrongdoer as to evince a reckless indifference of the rights of others." (Syl. ¶ 5.)

Referring to a decision of the Supreme Court of Alabama, the opinion stated:

". . . the Alabama court held that the burden of proof is sustained, once the injured party shows an entire want of care so as to raise the presumption that the person at fault is conscious of the probable consequences of his carelessness." (1. c. 708.)

The jury answered special questions finding that the defendant was guilty of negligence; that the plaintiffs were free from contributory negligence, and that they took all steps reasonably available to them to mitigate their damage.

The general verdict in favor of the plaintiffs imports a finding upon all the issues of the case and determined every controverted question of fact in support of which evidence was introduced. The defendant is a public utility authorized to do business in this state. When its property is devoted to public use, certain reciprocal rights and duties are raised by implication of law between the utility and the public it undertakes to serve. It has a duty to use the highest degree of care to protect the public in rendering service to its customers. 73 C. J. S., Public Utilities, § 4; *Henderson v. Kansas Power & Light Co.,* 184 Kan. 691, 339 P. 2d 702.)

The court's instructions to the jury were not abstracted, but the parties are agreed they correctly stated the law with respect to the burden of proof imposed upon the plaintiffs to recover actual and punitive damages. It was the province of the jury to weigh all of the evidence and draw inferences and conclusions therefrom

and it had the right to draw the inference that when Griffiths cut off the electrical current to the plaintiffs' residence he realized the imminence of injury to the plaintiffs from his act and was indifferent to whether it occurred, and that his conduct was in reckless disregard to their rights.

We cannot say as a matter of law that plaintiffs' evidence failed to establish gross negligence on the part of Griffiths as to amount to wantonness as above defined. Considering the evidence as a whole, it was sufficient to sustain the district court's approval of the jury's verdict for punitive damages, and that judgment is affirmed.

PRICE, J., dissents.