No. 44,227

James E. Grohusky, *Appellee* and *Cross-Appellant,* v. Atlas Assurance Company, Ltd., *Appellant* and *Cross-Appellee.*

(408 P. 2d 697)

Opinion filed December 11, 1965.

*Everett Fritz,* of Kansas City, argued the cause and was on the briefs for appellant.

*J. W. Mahoney,* of Kansas City, argued the cause, and *David W. Carson* and *John K. Dear,* of Kansas City, were with him on the briefs for appellee-cross-appellant.

The opinion of the court was delivered by

Fatzer, J.: This was an action to recover damages for the tortious breach of a fire insurance contract issued by the Atlas Assurance Company, Ltd., of Chicago, Illinois. The jury returned a verdict in favor of the plaintiff in the amount of $2,217.04 actual damages, and awarded him punitive damages in the sum of $1,000.00.

The facts are briefly summarized: Plaintiff had a fire loss on September 27, 1961, damaging the contents of his dwelling. He reported the loss to Atlas which employed Don E. McCosh, an adjuster with Underwriters Adjustment Company, as its agent to adjust the claim. McCosh's investigation disclosed plaintiff's property was co-insured under a homeowners' policy issued by the Republic Insurance Company of Dallas, Texas. Republic employed McCosh as its agent, so McCosh represented both insurers in the matter.

McCosh consulted with the plaintiff about repairs and replacements and they agreed that the amount of the loss was $877.59. McCosh prepared and submitted for plaintiff's signature, a proof of loss statement for each insurer. Atlas' proof of loss showed the

total loss as $877.59, and its portional share as $217.04. On November 2, 1961, the executed documents were forwarded to the home office of the respective insurance companies. Atlas examined the proof of loss in Chicago, circled the amount $217.04 appearing thereon, wrote "pay assured" upon the face of the proof of loss, and issued a check on November 6, 1961, for $217.04 in payment of the claim. The check was forwarded to Atlas' agent in Kansas City who delivered it to the plaintiff.

The plaintiff received payment for his loss from each insurer. McCosh urged him to immediately deposit both checks and pay the materialmen and repairmen. He endorsed the checks and deposited them in a joint checking account at the Riverview State Bank, upon which his wife was authorized to draw checks. Mrs. Grohusky drew checks on the joint account to pay materialmen and repairmen and other current obligations.

Meanwhile, Atlas discovered what it thought was an error in apportioning the loss between it and Republic. It notified Edward Switz, its state agent in Kansas City, of the claimed error, who in turn telephoned McCosh. During the ensuing conversation, McCosh was advised that Atlas was stopping payment on the $217.04 check it had issued and delivered to the plaintiff. McCosh requested that Atlas not stop payment on the check and suggested since the error involved only a question concerning apportionment, that Atlas should contact Republic and negotiate a settlement. Switz's answer was in the negative. On November 14, 1961, McCosh telephoned plaintiff advising him of Atlas' intention to stop payment on the check but assured him that the difficulty was a matter between the insurance companies and everything would be all right. The conversation was confirmed by letter on November 16, 1961, which also contained a corrected proof of loss showing Atlas' portional share as $121.85. Plaintiff refused to accept the second proof of loss.

Atlas' order stopping payment on the check caused the plaintiff's personal checks to "bounce." The Riverview State Bank rejected them for insufficient funds. The plaintiff was harassed by creditors who sought to recover the value of their dishonored checks. After discussing the matter with the bank, the plaintiff visited with John Lillig, Atlas' local agent from whom he had purchased the fire insurance policy. The plaintiff enumerated the events that transpired by testifying:

". . . I asked John, 'What's going on?' I says, 'I have got these checks bouncing.' I says, 'Why did they stop payment on this check?' and he said, 'I don't understand it,' and he got on the phone and immediately called somebody and they told him that everything would be all right, to just go ahead and tell them people to send their checks back through; and John said, 'Don't worry about it, just go on home, they will okay this check.' . . ."

Atlas was well aware of plaintiff's domestic and financial affairs. It knew he was married; that he had four minor children; that he worked for the City Health Department during the day and had to supplement his income as an automobile salesman at night and on weekends; that he lived from one paycheck to the next, and that his checking account was joint. Atlas' continual refusal to honor its check compelled the plaintiff, in order to protect his credit, to make personal loans from friends with which to reimburse the holders of his dishonored personal checks.

The trial consumed three days and the issues were vigorously contested. At the conclusion of the defendant's evidence, the case was submitted to the jury which returned its verdict for the plaintiff, and Atlas has appealed.

Atlas first contends the district court erred by admitting in evidence checks drawn by Mary H. Grohusky, the plaintiff's wife, on the joint back account. It argues that checks are not legally binding upon a plaintiff regardless of the surrounding circumstances unless he actually wrote them. We do not agree. The checks were dishonored because of insufficient funds rather than because of an unauthorized signature. Moreover, there was no evidence that the plaintiff failed to authorize or refused to ratify Mrs. Grohusky's acts.

We agree that neither husband nor wife has the power to act as the other's agent merely by virtue of the marital relation, however, an agency on the part of the wife to draw checks may be created by a deposit of money of the husband in a bank to the account of himself and his wife. (41 C. J. S., Husband and Wife, Sec. 65c, p. 539.) In *Wilson v. Haun,* 97 Kan. 445, 155 Pac. 798, it was held:

"To establish the relation of agency an express appointment and an acceptance thereof is not essential, but it may be implied from other facts, such as the statements of the parties, their conduct and the relevant circumstances." (Syl. ¶ 1.)

See, also, *Fritchen v. Mueller,* 132 Kan. 491, 297 Pac. 409; *State Exchange Bank v. Naylor,* 144 Kan. 703, 62 P. 2d 887; *Greep v. Bruns,* 160 Kan. 48, 159 P. 2d 803, and *Stevens v. Stag Drilling, Inc.* 173 Kan. 770, 252 P. 2d 616. Under the facts and circumstances

disclosed by the record, we think the district court did not err in admitting in evidence the checks written by Mrs. Grohusky on the joint bank account.

Atlas next contests the propriety of the district court's admission of plaintiff's testimony relating to statements made by McCosh, contending the statements were hearsay evidence. We have searched the record and find no objection by Atlas to the evidence or statements it claims were erroneously admitted into evidence, and we are compelled to be guided by K. S. A. 60-404 in disposing of the contention. This rule establishes a must requirement for trial court practice and requires a timely and clear objection to the admission of evidence. The rule simply restates the practice prevailing prior to the adoption of the section requiring specific and timely objections and the ignoring of harmless admission of evidence. (4, Vernon's Kansas Statutes Annotated, Code of Civil Procedure, pp. 191, 193, 194; Gard, *Kansas Code of Civil Procedure*, Sec. 404, p. 367.)

Atlas next contends the district court erred in permitting Achilles V. Wheat to testify as an expert witness as to ordinary practices and procedures of the insurance business, claiming that Wheat was not an expert in the general meaning of the term. We do not agree. K. S. A. 60-456 (*b*) and (*c*) provide:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness.

"Unless the judge excludes the testimony he shall be deemed to have made the finding requisite to its admission."

The uncontroverted evidence reveals that Wheat had 17 years experience in the insurance business. During that period, he became familiar with various insurance policies and adjusting procedures. In the course of his duties, he appointed adjusters to dispose of insurance claims and worked with them to solve the various problems that arose. He testified, "we do inject ourselves into loss adjustment situations."

Atlas complains that Wheat was not qualified because he had little or no formal training. A witness, in order to be competent as an expert, must show himself to be skilled or experienced in the business or profession to which the subject relates. There are no precise requirements as to the mode in which skill or experience shall

have been acquired. Scientific study and training is not always essential to qualify a witness as an expert. A witness may be competent to testify as an expert although his knowledge was acquired through the medium of practical experience rather than by scientific study and research. (20 Am. Jur., Evidence, Sec. 784, pp. 657, 658.) Fundamentally, the expert must be qualified to impart to the jury knowledge within the scope of his special skill and experience that is otherwise unavailable to the jury from other sources. The district court has the primary function to determine whether or not a witness is an expert. (2 Wigmore, 3rd Ed., Evidence, Sec. 561, [1940].) In the instant case, the district court is deemed to have made the finding as a prerequisite to the admission of Wheat's testimony. (K. S. A. 60-456 [c].)

Atlas also objects to Wheat's testimony that the instrument of payment it issued was a check. Wheat testified:

"Q. . . . assume further that after the Proof of Loss had been received from the adjuster that thereupon the Atlas Assurance Company, Limited, had issued the instrument which is marked as Plaintiff's Exhibit 2, and I will ask you to examine that.

"A. Looks like a standard loss check.

"Q. I want to ask you further, Mr. Wheat, after having examined Plaintiff's Exhibit 2, which is this standard loss check, what is the ordinary practice and custom in the insurance business as to whether or not this instrument is a check or a draft; how is it treated by people engaged in the insurance business and in the settlement of losses based upon your experience and in your opinion?

"A. Normally we receive them—we don't distinguish whether they are checks or drafts; I wouldn't know the difference; but normally when we receive from an insurance company or even from an adjustment company with authorization from the company a loss check or draft, we forward it to our customer with the full expectation it will be paid and this has always been so."

The rule is stated in 10 C. J. S., Bills and Notes, Sec. 5 (2), p. 410, as follows:

"The terms 'draft' and 'check' are, in some instances, used interchangeably and the ordinary meaning of the term 'check' is sufficient to include a draft, the only distinguishing feature between the two being that in the case of a draft the drawer is a bank while in the case of the ordinary check the drawer is an individual. *So an instrument purporting to be a draft which is drawn by the drawer upon itself and payable at a bank is in effect a check.*" (Emphasis supplied.)

Atlas prepared the instrument in question; it was payable through a bank; Atlas was the drawer, and plaintiff was the payee—it had all the characteristics of a check. Furthermore, on the reverse side of the check was a release which reads:

"In endorsing this draft I/we hereby acknowledge receipt of the amount hereof, in full satisfaction, final settlement, and compromise of all claims and demands for loss and damage, indicated on the face hereof."

The plaintiff's endorsement of the instrument, having the characteristics of a check, acknowledged full consideration from Atlas of all claims and damage by reason of the loss and waived all future claims he might have by reason of the loss. Under the circumstances heretofore related, we hold that the instrument was a check and not a draft which was subject to Atlas' acceptance in its branch office in Chicago.

Atlas asserts that the district court's instructions 8, 9 and 10 erroneously and prejudicially stated that law with respect to the check, draft, and apportionment of loss, and that it erred in refusing to give four of its requested instructions. The record shows the court changed its instructions and incorporated parts of Atlas' requests. The rule is well settled that error cannot be predicated on the refusal to give certain instructions where those given cover and include the substance of those which were refused. We see no useful purpose to prolong this opinion by setting forth the instructions. Suffice it to say we have carefully considered all arguments advanced by Atlas in support of its claims of error. Considering the instructions as a whole, we conclude they fairly and substantially stated the law applicable to the theories of the parties as presented by the evidence introduced at the trial.

The next question presented is whether there was sufficient evidence to support an instruction on punitive damages. In a recent case, *Kohler v. Kansas Power & Light Co.*, 192 Kan. 226, 387 P. 2d 149, we discussed the rule of punitive damages, and said:

". . . In the early case of *Telegraph Co. v. Lawson*, 66 Kan. 660, 72 Pac. 283, with citation of numerous cases, it was said:

" '. . . The rule is too well settled in this state to admit of modification or change, that in all actions to recover damages for negligence, where actual damages are recoverable, the plaintiff is entitled to recover exemplary damages if the negligence be so gross as to amount to wantonness. (Cases cited.) The term "wantonness" as here used does not necessarily mean malice, but a reckless disregard of rights of others.' (l. c. 662, 663.)

"In *Allman v. Bird*, 186 Kan. 802, 353 P. 2d 216, rules relating to the allowance of punitive damages, the purposes for which they are allowed, and the conditions and circumstances under which they may be recovered, were discussed and applied, and in the opinion it was said:

" '. . . this court has held that generally the intentional doing of a wrongful act with full knowledge of its character, and without cause or ex-

cuse, is malicious and warrants an award of exemplary damages. (Cases cited.)'" (1. c. 228.)

See, also, *Frazier v. Cities Service Oil Co.*, 159 Kan. 655, 157 P. 2d 822. In *Watkins v. Layton*, 182 Kan. 702, 324 P. 2d 130, the rule relating to the sufficiency of proof of punitive damages was stated, and it was held:

"The law does not require a specific finding of an intentional and ruthless desire to injure in order to sustain an award of punitive damages. The burden of proof is sustained, once the injured party shows such gross neglect of duty by the wrongdoers as to evince a reckless indifference of the rights of others." (Syl. ¶ 5.)

The plaintiff presented evidence that the agreed total loss of $877.59 was never contested by any party; that Atlas prepared the apportionment of loss; that it approved the apportionment in writing and directed that the check in the amount of $217.04 be made payable to the plaintiff; that it was aware of plaintiff's financial circumstances and knew that checks had been written on plaintiff's account; that its agent had urged it not to stop payment on the check and requested that Atlas's contact Republic and negotiate a settlement; and that plaintiff relied upon Atlas, assurance "that everything would be all right" and for plaintiff to tell the holders of his personal checks to "send their checks back through." Moreover, McCosh's cross-examination disclosed:

"Q. So they agree on the amount of $877, and isn't it a fact that the only reason that this company didn't pay the $217 that was shown in your apportionment, that they had had an opportunity to examine before they ever wrote this check or draft and sent it to the Grohuskys—the only reason they didn't pay it was not because of any disagreement with the Grohuskys but because of a disagreement that they thought they had with Republic?

"A. Yes.

. . . . . . . . . . . . .

"Q. I believe you testified that in your experience that sometimes drafts are not honored because there have been mistakes or that they are just not proper in some way. I want you to look at the name of the payee on this Plaintiff's Exhibit 2; that is James E. Grohusky, is it not?

"A. Yes.

"Q. And the endorsement is James E. Grohusky; that's proper, is it not?

"A. Yes.

"Q. It's the same?

"A. Yes.

"Q. So there is nothing wrong with the endorsement that would lead Atlas to refuse to pay it?

"A. No.

"Q. There are no alterations or erasures and no change in the figures, the amount that the Atlas Assurance Company originally drew this check or draft in was $217.04 which was the amount of the Proof of Loss that you prepared and your recommendation as to their payment, and they had written on the Proof of Loss to pay that amount so there is no question of a mistake in the amount, is there?

"A. No."

In view of the foregoing, we conclude it was proper for the district court to submit to the jury the issue of punitive damages.

Plaintiff contends in his cross-appeal that the district court erred by refusing an allowance of attorney's fees under K. S. A. 40-908 or K. S. A. 40-256. The action was for tortious breach of contract. The plaintiff was not compelled to institute an action to enforce provisions of his policy, but he sought to recover damages caused by Atlas' toritous conduct. Under those circumstances, we cannot say the district court erred in denying plaintiff's attorney his fee.

All points briefed and argued have been considered, but we think the foregoing disposes of all the contentions. The record discloses that a full and complete trial was had on the merits. The district court's instructions correctly stated the applicable law, and it approved the jury's verdict in favor of the plaintiff. The burden was upon Atlas to show that error was committed, but we find nothing in the contentions which require or warrant a reversal of the judgment. Accordingly, the judgment of the district court is affirmed with respect to both the appeal and the cross-appeal.

It is so ordered.