## WASHINGTON GAS LIGHT COMPANY v. THE AETNA CASUALTY & SURETY COMPANY, ET AL.

[No. 248, September Term, 1967.]

*Decided June 10, 1968.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, McWILLIAMS and FINAN, JJ.

*J. Hodge Smith,* with whom was *William E. Gallagher, Jr.* on the brief, for appellant.

*James T. Wharton* for appellees, with whom was *Albert E. Brault* on the brief, for Robert W. Lowe, another appellee.

FINAN, J., delivered the opinion of the Court.

Washington Gas Light Company appeals from the lower court's denial of its motion for a directed verdict in a negligence suit, wherein the jury returned a verdict in favor of the appellees, Aetna Casualty & Surety Company, *et al.,* for damages resulting when water pipes burst in a dwelling following a disconnection of service during sub-freezing weather.

On Wednesday, January 27, 1965, Mr. and Mrs. Richard L. Shetler, of Florida, purchased a residence at 10 Farmington Court, Chevy Chase, from the builder-owner Robert Lowe for $84,500.

On January 27, the settlement date, at the time of the inspection of the premises, later during the actual property settlement in an attorney's office, and still later on the parking lot near the attorney's office, the purchasers inquired of Lowe as to what arrangements were being made for the transfer of utilities; each time Lowe replied that he would handle the transfers. Lowe testified that he asked Shetler to confirm arrangements as soon as he returned with his family from Florida and informed him that it would be necessary for him to "verify these accounts" as the utilities might need additional information. This was denied by Shetler. Lowe admitted that he did not indicate to the Shetlers that service would be disconnected. Immediately after the

settlement, Shetler left for New York and then to Florida for the purpose of moving his family.

Lowe testified that about 4:30 P.M. he called the appellant, identified himself as the builder, requested that he read the meter, send him a final bill and transfer the gas service account to the name of the purchaser, Shetler. It is important to note that the transcript does not reveal that at any time Lowe requested or implied that the gas be turned off, and what is more significant, the representative of the Gas Company, with whom Lowe spoke, never stated that the gas would be turned off. There is evidence, however, that the representative informed Lowe that Shetler himself would have to request gas service, to which Lowe replied that Shetler was in the process of moving his family from Florida to Maryland and would call as soon as he arrived in Montgomery County. The Gas Company representative further testified that although he had no independent recollection of the telephone conversation with Lowe, the order form used by the Gas Company and marked by the witness revealed that Lowe had called on January 27, 1965, that the box provided on the form for a "Disconnect" had been marked with a check indicating that this was to be accomplished and a further notation appeared on the form indicating that the customer had been informed of the danger of water freezing in the pipes.

From the evidence it would appear that the Gas Company had not formulated any policy whereby it would determine whether or not there was a new occupant or new consumer moving into a house after it accepted a "Turn Off" or "Disconnect" call from the seller.

At 3:30 P.M. on the following Friday, January 29, Mr. Skipper, a serviceman from the Gas Company, came out to 10 Farmington Court, read the meter, and then proceeded to shut off all gas service, which included the forced-air heating system. Skipper testified that if he had an order to cut off gas in a heated house on a day when the temperature was sub-freezing, he would cut off the gas without checking back with his office to determine whether there might have been some mistake. Unaware of Skipper's visit, Lowe entered the house around 4:00 P.M. to inspect it for the weekend and turned the thermostat down to 70 degrees. He stated that the house was still

warm at the time he entered but the furnace was not then running. The records of the Weather Bureau at Washington National Airport indicate that the temperature had dipped below freezing nightly from January 10. The minimum temperature for early Friday was 19°, and the maximum reached only 33°. Over the following weekend the temperature never rose above 26°, and fell as low as 9°. We may assume these representative temperatures were even lower in suburban Maryland than at the airport.

Lowe next entered the house on Monday, February 1, at about 7:30 in the morning and immediately noticed that the house was cold. After ascertaining that the thermostat was not at fault and that the pilot light in the furnace was out he discovered that the main gas valve had been shut off. At 8:30 A.M. he requested the appellant to resume service, which was not completed until late that day.

The water pipes in the house had frozen and burst over the weekend, and when heat was restored late Monday, water flooded the house. On Tuesday morning the damage was discovered; both floors had been extensively damaged to the point of buckling, and all walls and ceilings were swollen and saturated, as was the carpeting. Consequently, the Shetlers were delayed in occupying the house and were forced to store their furniture and rent another home at considerable expense.

Aetna, the subrogee of the Shetlers, brought suit against Lowe, who then impleaded the Washington Gas Light Company as a third party defendant. Aetna was then granted leave to amend its declaration so as to join both Lowe and the Gas Company as co-defendants. Count One of the amended declaration alleged negligence on the part of both defendants, and count two alleged breach of a contract to arrange for transfer of utilities by Lowe. At the close of the plaintiff's case, the court granted defendant Lowe's motion for a directed verdict as to the second count but reserved its ruling on the first count, which it later denied. At the conclusion of the trial, the jury returned a verdict for the Shetlers against the defendant Washington Gas Light Company in the amount of $10,224.92, and a verdict in favor of the defendant Lowe.

The appellant argues that its motions for a directed verdict should have been granted, contending that it owed no duty to the Shetlers as prospective customers and that the Shetlers and/or Lowe were guilty of contributory negligence as a matter of law for not taking greater precautions to insure that utilities would not be turned off. We disagree with both contentions, and therefore affirm the judgments below.

In *Atlanta Gas Light Co. v. Jennings,* 72 S. E. 2d 735 (Ga. 1952), relied on by the appellant, the Court held that a gas utility company owed a duty to supply natural gas only to those who applied and paid for service and not to the entire public. Therefore, a boarder in the home of a customer could not sue the gas company for injuries and frostbite received when it shut off the gas. Although we do not challenge the accuracy of this statement of law, it seems to us that there is a world of difference between a boarder in the home of a customer, who admittedly is not in privity with the public utility, nor a prospective customer, and the Shetlers. In the case at bar the Shetlers were not only prospective customers but property owners into whose property the Gas Company was still supplying its product at the very time Lowe called on the 27th of January requesting the transfer of accounts. At that time Lowe had already sold the property and it was owned by the Shetlers, and as of that time the Gas Company was supplying the dwelling with gas. We believe that once the appellant was given notice that the Shetlers would be the new customers at 10 Farmington Court and that gas was then being supplied to their dwelling, they fell within the class of customers that the utility undertook to serve. This seems to be implied in *Kohler v. Kansas Power and Light Co.,* 387 P. 2d 149 (Kan. 1963), a case turning on a different point than the instant case, in that the utility shut off the electricity against the express instructions of the appellant, resulting in heavy spoilage of refrigerated food and damage to the house. The Kansas Supreme Court in reversing the lower court stated:

"The defendant is a public utility authorized to do business in this state. When its property is devoted to public use, certain reciprocal rights and duties are

raised by implication of law between the utility *and the public it undertakes to serve.* It has a duty to use the highest degree of care to protect the public in rendering service to its customers." *Id.* at 151. (Emphasis supplied.)

See also *Consolidated Gas Co. v. Connor,* 114 Md. 140, 78 A. 725 (1910).

We do not go so far as to hold that once a public utility is informed that ownership of a property has been transferred it owes a duty to maintain service until the new customer chooses to verify the transfer. We do believe, however, that once the appellant receives actual knowledge of a transfer of ownership at a time when the termination of service might present an obvious danger of damage to the premises, it owes an absolute duty to clearly and unambiguously inform the customer of its company regulations and policies and what action it intends to take. There was evidence in this case from which the jury could have concluded that such action was not taken by the Gas Company and hence could, as it did, find it guilty of negligence.

It cannot be conceded that all public utilities have a strict policy of disconnecting service at a specific location, and then reinstating service for a new customer, even if the interval between service calls is only a matter of hours; nor can it be conceded that, if the utilities have such a policy, the public is generally aware of it. Certainly the statements of Lowe at the trial of this case cast some question as to the prevalance of this practice. He testified that, in addition to calling Washington Gas Light Company, he also made similar calls to Potomac Electric Power Company, requesting a final electric bill, and Washington Suburban Sanitary Commission, requesting a final water bill. Both utilities sent representatives out to read the meter and both sent bills to Lowe without interrupting service. Regardless of the merits of the appellant's policy of disconnecting service rather than merely transferring service to a new customer, the appellant was obligated to make its intentions clear to its customers.

The conclusion we reach in this case is not wholly inconsistent with the case of *Cullinane v. Potomac Electric Power Co.,*

147 A. 2d 768 (D. C. Mun. 1959). In that case the plaintiff initiated electric service at a certain location requesting that the bills be sent to her home. The regulations of the utility, which were on file with the District Public Utilities Commission, required a deposit for new service, and a notice to this effect was sent to the customer's home. When she did not pay the deposit, the utility sent a second letter threatening discontinuance of service if no deposit was received by December 24. On that date they shut off the electricity and the resulting loss of electric heat caused the pipes to freeze and burst. In holding that the utility's right to properly discontinue service was not affected by foreseeable danger or damage to property, the Court stated:

> "It is a generally accepted principle of law that, in the absence of any unfair practice on the part of the public utility, the rules and regulations adopted by the utility, which are filed with and approved by the regulatory body, necessarily enter into any contract made with the utility; these rules are binding on both the customer and the utility, and actual knowledge thereof or assent is legally immaterial. Approval by the regulatory body is conclusive on the question of the utility's right to adopt a rule and its reasonableness."
> *Id.* at 770.

The opinion cannot be read to stand for the proposition that notice of the rules is immaterial, because the facts show that the customer was put on notice that her service would be discontinued. That itself is enough to distinguish *Cullinane* from the case at bar. However, there is an even more fundamental difference. Whereas the administrative rule applied in *Cullinane* was a matter of public record by reason of its being filed with the appropriate administrative agency, there is no evidence in the record of the instant case indicating that the appellant's practice of automatically disconnecting service was anything more than an unwritten company policy which had the less than salutary effect of creating more service calls and service charges. Under these circumstances, the Gas Company was bound to inform Shetler of its policy, and in the event it failed to do so,

in light of the imminent danger of freezing, such failure would amount to negligence on its part.

The lower court properly left the matter of the contributory negligence of Lowe or Shetler or both of them, for determination by the jury. The evidence concerning the actions of Lowe and Shetler regarding the transfer of the utility accounts from one name to the other was something about which reasonable minds could differ in finding their actions negligent. There is certainly no evidence which would warrant a finding of contributory negligence as a matter of law on the part of either or both. See, *Greer Lines Co. v. Roberts,* 216 Md. 69, 78, 139 A. 2d 235, 239 (1958) ; *Meldrum v. Kellam Distributing Co.,* 211 Md. 504, 128 A. 2d 400 (1957).

*Judgments affirmed with costs.*