No. 47,417

MICHELE CHARLEY, By Her Parents, JERRY CHARLEY and SONIA CHARLEY, *Appellant*, v. WILLIAM CAMERON, M. D., *Appellee*.

(528 P. 2d 1205)

Opinion filed December 7, 1974.

*Lantz Welch*, of Kansas City, Missouri, argued the cause, and *James D. Howell, Jr.*, of Overland Park, was with him on the brief for the appellant.

*Larry McMullen*, of Kansas City, Missouri, argued the cause, and *John J. Bukaty*, of Kansas City, was with him on the brief for the appellee.

The opinion of the court was delivered by

PRAGER, J.: This is an action brought by parents on behalf of their baby girl to recover damages for alleged injuries suffered in the course of her birth. The plaintiff-appellant is Michele Charley, who was born on June 7, 1970. Michele's parents are Jerry Charley and Sonia Charley, residents of Overland Park, Kansas. The defendant-appellee is William Cameron, M. D. who specializes in obstetrics and gynecology at the University of Kansas Medical Center at Kansas City. Immediately following birth it was discovered that Michele Charley had a "ping pong" indentation or fracture in the front portion of her skull. The basic claim of the plaintiff was that this indentation was caused by the negligent use of forceps by Dr. Cameron at the time of Michele's delivery.

This case was tried and submitted to a jury on the issue of Dr. Cameron's negligence in the use of forceps. The jury returned a

verdict in favor of defendant Dr. Cameron. The plaintiff has appealed to this court contending that the trial court erred in refusing to submit plaintiff's case to the jury on the theories of (1) lack of informed consent and (2) battery. There is no contention that the trial court erred in the manner in which it submitted the issue of medical negligence to the jury.

The first point raised by the plaintiff on this appeal is that the trial court erred by misinstructing the jury and in failing and refusing to instruct the jury on plaintiff's theory of lack of informed consent. The issue to be determined is whether or not the evidence presented at the trial was sufficient to support a submissible case on the theory of lack of informed consent. In order to determine this point it is essential that we carefully examine the evidentiary record. For purposes of determining the sufficiency of the evidence, we will draw all inferences in a manner favorable to the plaintiff.

Our story begins on October 2, 1969, when Sonia Charley, the plaintiff's mother, was examined by Dr. Geoffrey Logan, a physician on the staff of the K. U. Medical Center in the department of obstetrics and gynecology. On examination Dr. Logan found that Mrs. Charley was pregnant and that she had a normal pelvic region for the birth of a child. Thereafter Dr. Logan treated Sonia Charley during the first seven months of her pregnancy. Dr. Logan testified that he explained about labor and childbirth to both Mr. and Mrs. Charley and that they had many questions which he answered. During one visit Mrs. Charley brought up the subject of forceps, stating that she had seen a newborn child bearing forceps marks on his face and that she was disturbed about that. There was some discussion about the use of forceps. Dr. Logan testified that he explained to her that forceps marks usually resulted from the use of mid forceps which are applied *before* the baby has completely come through the pelvis.

At this point it would be helpful to discuss the use of forceps as a medical instrument used by physicians to assist in the delivery of babies. Obstetrical forceps generally may be described as finely tooled, carefully designed instruments which can be applied to the infant's head while it is still in the mother's pelvis. They are used to rotate the baby's head to a desirable position, and to aid in delivery by means of carefully applied traction or pulling pressure. During the application of low forceps, a medical doctor uses the forceps to assist the mother in the birth of the child after she has already brought the baby through her pelvis and the baby's head

has reached the floor of the pelvis. In childbirth the mother normally assists the birth of the child through the use of muscles in her pelvic region which aid the child in his passage from the womb to the outside world. The birth of a first child is more difficult than subsequent births. In order to reduce pain during labor it is quite common today to provide women with anesthetics. A common type of anesthetic used is called epidural anesthetic which has the effect of numbing the mother's body below the waist. In addition to numbing the mother's body, an epidural anesthetic restricts the use of the lower muscles and hence reduces the power of the mother to assist the child in being born. The result is that with an epidural anesthetic the mother needs more medical assistance to deliver her child.

Physicians specializing in obstetrics and gynecology routinely use low forceps to assist in the delivery of infants. This is especially true when the baby is a first child and the mother has been given an epidural anesthetic which numbs the mother's body below the waist. The undisputed medical testimony in this case showed that low forceps are used as a medical tool in childbirth in a large percentage of the cases. Dr. William Cameron testified that at the K. U. Medical Center, 75 percent of all babies are born with the use of low forceps and they are used in 95 percent of the cases where the child is the first baby and the mother had been given an epidural anesthetic. Dr. Geoffrey Logan, after distinguishing between mid forceps and low forceps, testified that the use of low forceps is almost routine for a delivery with the first baby and epidural anesthetic. This is true not only at the K. U. Medical Center but also at the Wichita Clinic. Dr. Paul Riekhof gave his opinion that low forceps are routinely used 50 percent of the time in all childbirths and that low forceps are definitely a safety advantage to the baby. Dr. William Griffin, an obstetrician and gynecologist at the University of Missouri, testified that low forceps are used 80 percent of the time with the first baby and epidural anesthetic. There is no testimony in the record contrary to the medical testimony just discussed.

The record shows that Dr. Logan treated Mrs. Charley for about seven months and on his recommendation Mrs. Charley transferred to the care of Dr. William Cameron. Dr. Logan left Kansas City to return to his home in Australia. Dr. Cameron is a specialist in obstetrics and gynecology and is on the teaching staff of the Uni-

versity of Kansas Medical Center. Dr. Cameron first examined Sonia Charley on April 2, 1970, and thereafter on seven other occasions before the delivery of her baby. He found nothing unusual or abnormal about her pelvic region. Apparently, Mrs. Charley's pregnancy continued in a normal way until the child was born on June 7, 1970. During the latter stages of her pregnancy, Mr. and Mrs. Charley attended classes conducted for expectant parents at the Medical Center. The classes informed expectant parents about childbirth and operative deliveries. Both the Charleys and Dr. Cameron and also Dr. Logan testified as to a number of conversations in regard to Mrs. Charley's condition, what was happening and what was going to happen during the course of her pregnancy, what was expected to happen during childbirth.

In regard to the use of forceps the evidence is clear that Sonia Charley had a fear of their use and did not want forceps to be used on her baby if it could be avoided. Mrs. Charley testified that neither Dr. Logan nor Dr. Cameron ever told her that forceps would not be used at the K. U. Medical Center. Her testimony varied to a degree, but it is clear that her fear of the use of forceps was communicated to Dr. Cameron and she trusted him in the use of forceps to do what was best on the basis of his medical experience. Mrs. Charley stated that she just told Dr. Cameron how she felt about forceps and trusted he would do what was best for her and the baby. She was willing for him to be her doctor on that basis. As to the use of forceps the substance of her testimony was that she could not make that decision; she would have to rely on the doctor for medical decisions. This conversation with Dr. Cameron took place on only one occasion prior to the birth of the child. The only time thereafter Mrs. Charley ever mentioned the use of forceps was in the delivery room at the time the child was born.

On June 7, 1970, at about 1:30 a. m. the Charleys went to the K. U. Medical Center because Mrs. Charley was in labor. She was examined by Dr. Paul Riekhof, the on-duty staff resident in obstetrics and gynecology. He periodically examined her during her labor and did not find anything abnormal or unusual. At 5:30 a. m. Dr. Riekhof examined her and concluded she had not reached the second stage of labor at that time. At about 7:00 a. m. he examined her again and found that she was then in the second stage of labor. He then injected the epidural anesthetic and had Mrs. Charley placed in the delivery room. Dr. Riekhof notified Dr. Cameron of the impending childbirth.

From this point on the factual circumstances become important in determining whether or not Mrs. Charley consented to the use of forceps by the delivering physician and whether or not her consent was an informed consent. Jerry Charley remained in the delivery room with his wife and Dr. Riekhof as the childbirth continued. Mrs. Charley pushed the head of the baby to a crown. The term "crown" means that the baby's head can be seen outside of the mother's body. Dr. Riekhof testified that he could see Mrs. Charley push the baby's head to crown but that the baby's head would fall back into the mother's body. Dr. Riekhof concluded that the baby was not progressing normally toward delivery. Dr. Riekhof then inserted his fingers inside Mrs. Charley and tested her coccyx. The coccyx is a bone in the pelvic region. It is less than an inch long and is like the tip of the little finger or a bump protruding into the pelvic passageway. Although the coccyx may present an obstruction to the birth of a baby, it will normally yield or move aside during birth and even a protruding coccyx will yield. Dr. Riekhof found that in Mrs. Charley's situation the coccyx contributed to an obstruction of the birth passage. As a result, the baby's head would crown against the coccyx and would then slide back into her mother's body.

At 7:30 a. m. Dr. Cameron arrived at the delivery room. Dr. Riekhof described the course of the childbirth to Dr. Cameron and they talked about the lack of progress toward delivery. Dr. Riekhof advised Dr. Cameron that the baby's head was "riding upon the coccyx," that the coccyx was contributing to the obstruction of the birth passage at that point. Dr. Cameron then testified that he pressed the coccyx with his fingers and found it springy. He concluded in his medical judgment that low forceps should be used to lift the head of the baby over the coccyx. The evidence is undisputed that Dr. Cameron was handed the forceps and that he positioned them for use. Before he used them Dr. Cameron announced to everybody in the delivery room that it was his belief that the baby was having trouble coming over the coccyx and he was going to try to lift the baby over, and if that did not work, he might be forced to go in and break the coccyx. Mrs. Charley testified that she heard Dr. Cameron and saw him handed the forceps in the delivery room. When she heard Dr. Cameron, she immediately said the single word, "forceps?" The word was said to everybody in general and nobody responded. She testified that she was sure Dr. Cameron knew what he was doing, that she was not

really in a position to say anything. She wasn't happy for him to use forceps but was willing for him to use them if he felt what he was doing was necessary. She does not remember any objections to his using the forceps made in the delivery room. Jerry Charley testified that he was content to leave the judgment as to the use of the forceps up to the doctor if there was an emergency situation, that in the operating room he knew that Dr. Cameron was using forceps and raised no objection as to their use. Dr. Cameron then used forceps to deliver the baby and during the course of delivery Mrs. Charley's coccyx was dislocated.

We must first determine whether or not under this evidence there was a consent by the parents to the operative procedure involved here. It is, of course, undisputed that Dr. Cameron was employed as an obstetrician and gynecologist to care for Mrs. Charley during the course of her pregnancy and to deliver the child. It could not reasonably be maintained that Dr. Cameron delivered the baby without the mother's consent. Furthermore, the evidence simply does not justify a finding that Dr. Cameron ever told Mrs. Charley that forceps would not be used as a medical aid in delivering Mrs. Charley's baby. There is nothing in the evidence to show that low forceps are dangerous when properly used by the physician. As pointed out above forceps are routinely used where the child is a first child and an epidural anesthetic has been used on the mother. All the medical experts agreed that specific consent to the use of forceps is never obtained by medical practitioners prior to their use. The thrust of the medical testimony was that forceps are a medical tool and are to be used whenever good medical judgment dictates their use. The evidence was undisputed that Dr. Cameron told both parents in the delivery room that he was going to use forceps and they did not object to their use. Although Mrs. Charley expressed to both Dr. Cameron and Dr. Logan her fear of forceps because of the marks she had seen left on a baby's face, she trusted that Dr. Cameron would do what he felt was best. The use of forceps was a medical decision and she relied upon Dr. Cameron to exercise his medical judgment as to their use.

On the basis of the entire record here we cannot say that there was evidence which supports the proposition that Dr. Cameron used low forceps in the delivery of Michele Charley without the consent of the parents. We have held that consent to the performance of an operation may be granted by conduct. (*Younts v. St. Francis Hospital & School of Nursing*, 205 Kan. 292, 469 P. 2d 330.)

Here both Mr. and Mrs. Charley by their own testimony established beyond question that it was their intention that Dr. Cameron should use forceps in connection with the delivery of the child if in his medical judgment they were necessary. He exercised his medical judgment and used them in the delivery. Hence, we must conclude that forceps were used with the consent of the parents.

Having found that the parents consented to the use of forceps, we must next determine whether or not the evidence was sufficient to show a lack of an informed consent. The law of informed consent has been recognized in a number of our cases. (*Natanson v. Kline,* 186 Kan. 393, 350 P. 2d 1093; *Williams v. Menehan,* 191 Kan. 6, 379 P. 2d 292; *Collins v. Meeker,* 198 Kan. 390, 424 P. 2d 488; *Yeates v. Harms,* 193 Kan. 320, 393 P. 2d 982; *Younts v. St. Francis Hospital & School of Nursing,* supra; *Funke v. Fieldman,* 212 Kan. 524, 512 P. 2d 539; *Tatro v. Lueken,* 212 Kan. 606, 512 P. 2d 529; *Stovall v. Harms,* 214 Kan. 835, 522 P. 2d 353.) The cases have recently been discussed in some depth by Mr. Justice Kaul in *Tatro v. Lueken,* supra. We do not deem it necessary to review again in this opinion all of our cases on the subject. In *Collins* we held that where disclosures of possible results of medical or surgical procedures have been made to a patient and are ascertainable, expert medical testimony is ordinarily necessary to establish that they were insufficient to accord with disclosures made by reasonable medical practitioners under the same or like circumstances. In *Yeates* in commenting on the extent of disclosure necessary, we refused to extend the rule of informed consent to require a physician to apprise his patient not only of the known risks but also of each infinitesimal, imaginative, or speculative element that would go into making up such risks. In *Tatro* we again emphasized that the duty of a physician is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances. We further held that what is a reasonable disclosure upon which an informed consent may rest depends upon the facts and circumstances of each case. When we examine the uncontroverted evidence in this case it is crystal clear that the use of low forceps in delivery of a baby is not hazardous when used with reasonable care, that they are routinely used as a medical tool in the delivery of babies and that reasonable medical practitioners do not mention low forceps hazards or obtain specific consent for their use. It is undisputed that some disclosures were made here by the physician in regard to the use of low forceps.

Once some information has been given, the burden is on the plaintiff to produce evidence that the information was insufficient to meet medical standards. No evidence whatsoever was produced on behalf of the plaintiff to show that the disclosures were inadequate. In the absence of such evidence, the trial court was required under the cases cited above to withdraw the issue of lack of informed consent from consideration by the jury. In doing so it did not commit error.

The second point raised by the plaintiff on this appeal is that the trial court erred in refusing to submit the issue of battery to the jury. As pointed out under the first point, the parents were willing for Dr. Cameron to use low forceps if in his medical judgment they were necessary. Consent to the use of forceps having been granted, there was no battery. The trial court properly refused to submit the case to the jury on that theory.

For the reasons set forth above the judgment of the trial court is affirmed.