Michel LOUNSBURY, Plaintiff
and Appellant,

v.

Neal C. CAPEL, M.D., Defendant
and Appellee.

No. 910584–CA.

Court of Appeals of Utah.

July 17, 1992.

Rehearing Denied Aug. 18, 1992.

Certiorari Denied Dec. 1, 1992.

Floyd W. Holm, Cedar City, for plaintiff and appellant.

Elliot J. Williams and Elizabeth King, Salt Lake City, for defendant and appellee.

Before BENCH, P.J., and GREENWOOD and ORME, JJ.

## OPINION

ORME, Judge:

Plaintiff, Michel Lounsbury, sought to recover damages from defendant, Dr. Neal Capel, alleging that Dr. Capel performed surgery on him without his consent. At trial, a jury was impaneled and heard opening statements. However, the parties at that point agreed that, prior to presenting their respective cases to the jury, they would present their evidence to the court by proffer, and ask the court to rule on what amounted to a motion for directed verdict following the proffers. It is clear from the proffers that several factual issues were vigorously contested. Nevertheless, the district court concluded that even according to the facts as alleged by Lounsbury, he had shown no right to recovery because: 1) Lounsbury had failed to establish the elements of an action for "failure to obtain informed consent" as required by Utah Code Ann. § 78–14–5(1) (1987) and 2) the consent to Lounsbury's surgery, signed by his wife, constituted an absolute defense under Utah Code Ann. § 78–14–5(2)(e) and –5(4)(b) (1987) to Lounsbury's claim that Dr. Capel operated on him without his consent. Lounsbury appeals from the district court's entry of judgment in favor of Dr. Capel. Because we disagree with the district court's interpretations of section 78–14–5, we reverse and remand for further proceedings.

## FACTS

It is important to note at the outset that we recount the following facts as proffered by Lounsbury. It is undisputed on appeal and axiomatic that, because the factual issues were never resolved at trial, we must examine the evidence in the light most favorable to the losing party. Accordingly, although the facts are contested in several material respects by Dr. Capel, we take as true, solely for purposes of this appeal, the facts as proffered by Lounsbury.

Lounsbury was employed by a construction company in Beaver County, Utah. On October 10, 1986, Lounsbury injured his back while at work, sustaining a compression fracture to one of the vertebrae in his back. Lounsbury consulted several doctors about his condition, and was ultimately referred to Dr. Glen Momberger in Salt Lake City.

Dr. Momberger examined Lounsbury on March 25, 1987, and initially continued Lounsbury's ongoing program of "conservative care," which consisted of rest and pain medication. Ultimately, Dr. Momberger ordered a "myelogram," a test which allows the physician to examine the condition of the discs between the vertebrae in the back. Dr. Momberger concluded that Lounsbury had a herniated disc which was impinging on Lounsbury's nerves and causing him pain. Accordingly, Dr. Momberger

suggested that Lounsbury consider surgery to remove the disc material. Because Lounsbury had misgivings about having surgery, he requested a second opinion. Lounsbury was referred to Dr. Capel.

Dr. Capel examined Lounsbury on April 22, 1987. Lounsbury claims to have had "apprehensions" about Dr. Capel from the start, due to a somewhat painful preliminary examination by Dr. Capel. Moreover, Lounsbury felt Dr. Capel did not seriously review the x-ray and myelogram results that Lounsbury had brought with him. Rather, he felt that Dr. Capel had "prejudged" that Lounsbury should have surgery and that Dr. Capel was eager to go forward with the surgery.

During this initial visit, Dr. Capel's assistant called the hospital to schedule a myelogram for May 14, 1987, and surgery for the next day. At that time, Lounsbury told the assistant that he would not decide whether to have surgery until after the myelogram was performed and Dr. Capel had fully reviewed the results of that myelogram with him. Lounsbury hoped that a review of the myelogram would indicate some improvement in his condition so he would not need to have the surgery.

Prior to his being admitted to the hospital, Lounsbury, his wife, Dr. Capel, and Dr. Capel's assistant were all present in Dr. Capel's office. Lounsbury told Dr. Capel that he would not decide whether to have the surgery until after he had had an opportunity to see the new myelogram results and discuss them with Dr. Capel.

On the morning of May 14, Lounsbury was admitted to the Dixie Medical Center. After the scheduled myelogram was performed, a nurse requested that Lounsbury sign a consent form for the surgery. Lounsbury refused, stating he had not yet decided about the surgery because he had not seen the results of the myelogram. Lounsbury was returned to his room and given pain medication at approximately 1:00 p.m.

Sometime later that afternoon, a nurse anesthetist talked to Lounsbury and his wife about the anesthesia for Lounsbury's scheduled surgery. The anesthetist had brought a consent form for the anesthesia services. Lounsbury declined to sign the form, stating that he wanted an opportunity to talk with his doctor before he would agree to have the surgery.

Between 5:00 and 6:00 p.m., Dr. Capel and his assistant came to the door of Lounsbury's hospital room and told Lounsbury that they were going to get the results of the myelogram and would "be back later to talk." Dr. Capel never returned to Lounsbury's room. Lounsbury's wife left the hospital that evening at approximately 9:30 p.m. Lounsbury continued to receive pain medication and went to sleep that night.

The first thing Lounsbury remembered upon awakening is that he received a shot—apparently of preoperative medication—around 6:20 the morning of May 15. Lounsbury has no recollection other than feeling the shot and apparently going back to sleep. Contrary to the proffer on behalf of Dr. Capel, Lounsbury has no recollection of telephoning his wife and asking her to come to the hospital to sign some paperwork.

When Mrs. Lounsbury arrived at the hospital the morning of May 15, Lounsbury was unconscious. She was given a "stack of papers" by "a couple of nurses" who said, "Here. You need to sign these." Under the circumstances, Mrs. Lounsbury felt "intimidated" and "pressured" and did not want to ask any questions. She assumed that Lounsbury had talked to Dr. Capel and had agreed to the surgery following review of the myelogram. Therefore, she went ahead and signed the papers. She had no opportunity to talk with Dr. Capel or Lounsbury. Immediately after she had signed the paperwork, Lounsbury was wheeled out of his room and into surgery.

Following the surgery, Lounsbury did not recover and return to work as he expected he would. Rather he claims that he was, and still is, in "continual pain" and has been unable to work. Moreover, he has experienced "mental depression" and "psychological problems" associated with the surgery and his continuing pain.

■ Approximately two years after the surgery, on April 14, 1989, Lounsbury filed a complaint against Dr. Capel, alleging he did not consent to the surgery performed by Dr. Capel and, therefore, that Dr. Capel's performance of the surgery constituted a battery upon him.[1] Lounsbury did not allege that Dr. Capel in any way negligently performed the surgery.

Trial commenced on January 29, 1990. A jury was impaneled and heard the opening statements of each party's counsel. Following opening statements, the noon recess was taken. Upon reconvening, the court, Lounsbury, Lounsbury's counsel, and Dr. Capel's counsel, out of the presence of the jury, agreed to proceed by submitting evidence by proffer to the court. Essentially, each party's counsel proffered to the court the evidence they planned to present to the jury and, following the proffer, asked the court to rule on a motion to dismiss or motion for directed verdict.

It was clear from the proffered evidence that the parties' versions of the events leading to the surgery differed substantially. The court nevertheless concluded that judgment should be entered for Dr. Capel because, even if the facts as alleged by Lounsbury were true, Lounsbury had failed to state a cognizable claim for relief. The court so concluded for two reasons.

First, the court concluded that Lounsbury's claim was one of "failure to obtain informed consent" and, accordingly, was governed by section 78–14–5(1) of the Health Care Malpractice Act.[2] Thus, Lounsbury would have to prove each element required by section 78–14–5(1) for such a claim.[3] The court concluded, based on the proffered evidence, that Lounsbury could not establish that he suffered personal injuries arising out of the health care rendered, as required by subsection (c); that a reasonable, prudent person in Lounsbury's position would not have consented to the health care rendered after having been fully informed as to all the facts relevant to the decision to give consent, as required by subsection (f); and that the unauthorized part of the health care rendered was the proximate cause of personal injuries suffered by Lounsbury, as required by subsection (g). Second, the court concluded, based on sections 78–14–5(2)(e) [4]

1. In this regard, Dr. Capel proffered testimony that, until the filing of the complaint two years later, there was no intimation by Lounsbury that he had not consented to the surgery. Lounsbury voiced no such complaint during the entire week of his stay in the hospital following the surgery, nor during any of his follow-up visits to Dr. Capel. However, the extent to which this conduct bears on the issue of Lounsbury's consent is for the factfinder to determine. We cannot say, as a matter of law, that it invalidates his claim.

2. Utah Code Ann. §§ 78–14–1 to –16 (1987 & Supp.1991).

3. Section 78–14–5(1) provides:
   When a person submits to health care rendered by a health care provider, it shall be presumed that what the health care provider did was either expressly or impliedly authorized to be done. For a patient to recover damages from a health care provider in an action based upon the provider's failure to obtain informed consent, the patient must prove the following:
   (a) that a provider-patient relationship existed between the patient and health care provider; and
   (b) the health care provider rendered health care to the patient; and

   (c) the patient suffered personal injuries arising out of the health care rendered; and
   (d) the health care rendered carried with it a substantial and significant risk of causing the patient serious harm; and
   (e) the patient was not informed of the substantial and significant risk; and
   (f) a reasonable, prudent person in the patient's position would not have consented to the health care rendered after having been fully informed as to all facts relevant to the decision to give consent. In determining what a reasonable, prudent person in the patient's position would do under the circumstances, the finder of fact shall use the viewpoint of the patient before health care was provided and before the occurrence of any personal injuries alleged to have arisen from said health care; and
   (g) the unauthorized part of the health care rendered was the proximate cause of personal injuries suffered by the patient.
   Utah Code Ann. § 78–14–5(1) (1987).

4. Section 78–14–5(2) provides:
   It shall be a defense to any malpractice action against a health care provider based upon alleged failure to obtain informed consent if:
   . . .
   (e) the patient or his representative executed a written consent which sets forth the

and 78–14–5(4)(b)[5] of the Health Care Malpractice Act, that the consent to Lounsbury's surgery signed by his wife constitutes an absolute defense to Lounsbury's claim.

On appeal, Lounsbury argues essentially two points. First, he contends that the district court erroneously construed section 78–14–5(1) to bar his common law claim for battery, for which proof of actual injury is not required. In the alternative, if the district court properly interpreted section 78–14–5(1), the section is unconstitutional because it denies him a remedy for battery, thus denying him due process of law, equal protection, and uniform application of the law. Second, Lounsbury argues that the district court improperly interpreted section 78–14–5(4)(b) as authorizing his wife to consent to his surgery, when he was capable of giving his own consent and had expressly refused to do so. In the alternative, if the construction given to section 78–14–5(4)(b) was correct, the section is unconstitutional because it deprives him of liberty without due process of law and invades his fundamental right to privacy.

## STANDARD OF REVIEW

■ The conclusions reached by the district court about the Health Care Malpractice Act are accorded no particular deference; a trial court's interpretation of a statute presents a question of law which is reviewed on appeal for correctness. *Ward v. Richfield City*, 798 P.2d 757, 759 (Utah 1990); *State ex rel. Division of Consumer Protection v. Rio Vista Oil, Ltd.*, 786 P.2d 1343, 1347 (Utah 1990); *Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1038 (Utah

1989). Moreover, whether a statute applies, given particular facts, is also a question of law. *Cf. Klinger v. Kightly*, 791 P.2d 868, 870 (Utah 1990) (whether "discovery rule" applies to toll statute of limitations in surveyor negligence action poses question of law).

## APPLICABILITY OF SECTION 78–14–5(1)

■ Lounsbury contends section 78–14–5(1) is inapplicable to his common law battery claim. He argues that this section is directed solely at claims for lack of *informed* consent, whereas his claim of battery is premised on his allegation that he gave no consent whatsoever, informed or otherwise. Thus, Lounsbury argues that the district court erred in concluding that he must prove the elements required by section 78–14–5(1) in this action. We agree.

■ As Lounsbury points out, holding that section 78–14–5(1) applies not only to claims based on lack of informed consent, but also to claims based on no consent, would improperly expand the intended scope of the statute to foreclose battery claims against health care providers. This would be anomalous because battery is an intentional tort, while failure to obtain informed consent is rooted in negligence, i.e., that the failure to give particular warnings or disclose particular risks fell below the applicable standard of care. Common law battery does not require that the nonconsensual contact be injurious. Rather, proof of an unauthorized invasion of the plaintiff's person, even if harmless, entitles him

nature and purpose of the intended health care and which contains a declaration that the patient accepts the risk of substantial and serious harm, if any, in hopes of obtaining desired beneficial results of health care and which acknowledges that health care providers involved have explained his condition and the proposed health care in a satisfactory manner and that all questions asked about the health care and its attendant risks have been answered in a manner satisfactory to the patient or his representative; such written consent shall be a defense to an action against a health care provider based upon failure to obtain informed consent unless the patient

proves that the person giving the consent lacked capacity to consent or shows by clear and convincing proof that the execution of the written consent was induced by the defendant's affirmative acts of fraudulent misrepresentation or fraudulent omission to state material facts.
Utah Code Ann. § 78–14–5(2)(e) (1987).

5. Section 78–14–5(4) provides: "The following persons are authorized and empowered to consent to any health care not prohibited by law: ... (b) any married person, for a spouse...." Utah Code Ann. § 78–14–5(4) (1987).

to at least nominal damages. W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 9, at 40 (5th ed. 1984).

Section 78–14–5(1), on the other hand, requires that a patient prove, among other things, that the patient suffered personal injuries arising from the health care to which he purportedly consented, but without proper disclosure of the attendant risks. Thus, holding that a "no consent" claim falls within the rubric of section 78–14–5(1) would mean that a Utah plaintiff who claims to have received medical treatment to which he did not consent, but who cannot claim to have suffered injury from the treatment, would have no cause of action against the care provider. We cannot conclude the Legislature intended such a result.[6]

The language of the statute clearly states that a patient must prove certain elements in order to recover damages based upon a health care provider's failure to obtain *informed* consent. The term "informed consent" has a "peculiar and appropriate meaning in law" and, as such, Utah law requires that it be "construed according to such peculiar and appropriate meaning." Utah Code Ann. § 68–3–11 (1986)

(rules of construction as to words and phrases). Informed consent refers to the "general principle" that a "physician has a duty to disclose ... to his patient ... whatever grave risks of injury might be incurred from a proposed course of treatment, so that a patient ... may intelligently exercise his judgment" regarding whether to undergo the treatment. Black's Law Dictionary 701 (5th ed. 1979). Accordingly, it would appear that an action based on failure to obtain informed consent is distinct from a battery action based on failure to obtain any consent at all, and each theory is reserved for appropriate factual situations.

An examination of relevant case law tends to support this conclusion, although counsel have not pointed us to any Utah case that has squarely confronted this issue.[7] It appears well settled that the battery theory remains applicable where a medical treatment or procedure is completely unauthorized, whereas the doctrine of informed consent, grounded in negligence principles, applies to the much more frequently encountered situation where the treatment or procedure was authorized, but

---

**6.** To illustrate the absurdity of such a result, imagine that an unwary person waiting at a bus stop is seized by a young, overeager physician who whisks him off to a nearby hospital and removes his appendix. Imagine further that the unwilling patient's appendix was in a deteriorated condition, suggesting eventual removal, and the surgery was skillfully performed. Taking Dr. Capel's argument to its logical conclusion, the patient would have no cause of action against the physician, since the patient could show no personal injury. The result would apparently be the same even if the unwitting patient happened to be a Christian Scientist.

**7.** Dr. Capel's citation to *Baxter v. Snow,* 78 Utah 217, 2 P.2d 257 (1931), is not particularly helpful. First, *Baxter* arose long before the enactment of the statutory provisions at issue here. Moreover, the court did not hold that a battery claim could never be stated against a doctor; it merely held that the evidence in that particular case was insufficient to uphold such a claim because there was *no* evidence that plaintiff did anything other than voluntarily submit to the treatment. Moreover, insofar as *Baxter* and section 78–14–5(1) support a presumption in favor of the physician, we hold nothing to the contrary here. As discussed *infra,* the burden will

be on Lounsbury to demonstrate that he did not either expressly or impliedly consent to the surgery.

Dr. Capel also cites several cases which held that a plaintiff could not recover on a claim of battery where the evidence showed, as a matter of law, that he had impliedly consented. *See, e.g., Charley v. Cameron,* 215 Kan. 750, 528 P.2d 1205 (1974); *Grannum v. Berard,* 70 Wash.2d 304, 422 P.2d 812 (1967). Dr. Capel claims that Lounsbury should be similarly precluded from stating a battery claim because he also impliedly consented to the surgery. The cases cited are inapposite. We do not dispute that a patient's consent to surgery can be given either expressly or impliedly. In this case, however, the facts surrounding Lounsbury's conduct were. vigorously contested and were never resolved. Rather, he was cut short by the trial court's conclusion that he was required to prove all the elements of an informed consent action under section 78–14–5(1). We merely hold that this is not an "informed consent" action and, accordingly, Lounsbury need not prove all those elements. We agree, however, with Dr. Capel's contention that at trial the jury will be entitled to find that Lounsbury did indeed consent to his surgery, if, for example, it concludes that his conduct manifested implied consent.

proper disclosure of the risks inherent in the treatment was not given. While any number of cases and treatises support this distinction,[8] the point is perhaps best made in *Baltzell v. Van Buskirk,* 752 S.W.2d 902, 906 (Mo.App.1988), where the court observed:

A battery is an intentional tort which, by definition, is not a cause of action for negligence. A claim in battery or trespass may lie ... where an operation is performed without the patient's consent or where the operation is not the surgical procedure to which the patient gave his consent. By contrast, where the consent to the treatment was given but with insufficient or incomplete disclosure of risks, the cause of action is in medical malpractice based on negligence of the physician to meet a recognized standard of care.

*Id.* at 906 (citations omitted).

Therefore, we find nothing in case law or secondary sources to suggest that the doctrine of informed consent has displaced the common law remedy of battery in cases of *no* consent. Because the informed consent doctrine apparently began as an offshoot of battery, for a time there was confusion concerning whether a lack of informed consent case should proceed upon a theory of battery or negligence. *See* 2 David W. Louisell & Harold Williams, Medical Malpractice, ¶ 22.04 (1991). Most courts, however, have concluded that an informed consent action is more properly grounded in negligence, and reserve battery solely for the cases involving a complete lack of consent.[9] *Id. See, e.g., Baltzell,* 752 S.W.2d at 906 (lack of informed consent is not within concept of battery, "which is reserved for cases where the physician ignores patient's request for explanation or where a patient consents to one type of treatment but physician performs a substantially different treatment"); *Miller v. Kennedy,* 11 Wash.App. 272, 522 P.2d 852, 860 (1974), *aff'd,* 85 Wash.2d 151, 530 P.2d 334 (1975) (operation without consent is battery; failure to advise patient of perils is considered under negligence concepts). However, no authority with which we have been acquainted suggests that a battery case based on a complete lack of consent should be pursued through the negligence principles of the informed consent doctrine.[10] Thus, we find no support for the

---

**8.** *See, e.g., Szkorla v. Vecchione,* 2 Cal.App.4th 1208, 283 Cal.Rptr. 219, 226 *reh'g granted,* 286 Cal.Rptr. 779, 818 P.2d 62 (1991); *Blades v. DaFoe,* 666 P.2d 1126, 1129–30 (Colo.App.1983), *rev'd on other grounds,* 704 P.2d 317 (Colo. 1985); *Bloskas v. Murray,* 646 P.2d 907, 914 (Colo.1982); *Nishi v. Hartwell,* 52 Haw. 188, 296, 473 P.2d 116, 118–19 (1970); *Kinikin v. Heupel,* 305 N.W.2d 589, 593–94 (Minn.1981); *Baltzell v. Van Buskirk,* 752 S.W.2d 902, 906 (Mo.App.1988); *Gerety v. Demers,* 92 N.M. 396, 589 P.2d 180, 191–92 (1978); *Eis v. Chesnut,* 96 N.M. 45, 627 P.2d 1244, 1246–47 (App.), *cert. denied,* 96 N.M. 116, 628 P.2d 686 (1981); *Scott v. Bradford,* 606 P.2d 554, 557 (Okla.1980); *Miller v. Kennedy,* 11 Wash.App. 272, 522 P.2d 852, 860 (1974), *aff'd,* 85 Wash.2d 151, 530 P.2d 334 (1975); *Roybal v. Bell,* 778 P.2d 108, 111 (Wyo. 1989); 2 David W. Louisell & Harold Williams, Medical Malpractice, ¶ 22.04 (1991); W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 18, at 118–19 (5th ed. 1984).

**9.** Some courts, however, have concluded that an informed consent case may be pursued through either battery or negligence principles. *See, e.g., Kinikin v. Heupel,* 305 N.W.2d 589, 593–94 (Minn.1981) (patient who refused to have breast removal without proof of cancer and had breast removed without proof of cancer, was entitled to submit both theories of battery and negligent nondisclosure); *Brown v. Wood,* 202 So.2d 125, 130 (Fla.App.1967) (plaintiff has choice of bringing either negligence or battery action).

**10.** It has been held in Arizona that the common law right to sue a physician upon a theory of assault and battery was abrogated by statute. However, contrary to the Utah statute at issue here, the Arizona statute in question states exactly that. It reads: "No medical malpractice action brought against a licensed health care provider shall be based upon assault and battery." Ariz.Rev.Stat.Ann. § 12–562(B) (1982). Moreover, a federal court applying Arizona law concluded that the statute violates certain articles of the Arizona Constitution, which limit the legislature's power to abrogate rights existing at common law. *Rubino v. De Fretias,* 638 F.Supp. 182, 185–86 (D.Ariz.1986) (statute violates Article 2, Section 31, and Article 18, Section 6, of Arizona Constitution). The Arizona state appellate courts have apparently not addressed the issue. *Id.* at 183 n. 2.

Dr. Capel cites several cases which purportedly have held that the negligence principles underlying the informed consent doctrine govern all cases about lack of consent, both un-

contention that the common law claim of battery, in a case where *no* consent was obtained, has been supplanted by the doctrine of informed consent which is embodied in section 78–14–5(1).

Moreover, construing section 78–14–5(1) to apply to no-consent cases would lead to inequitable results. A typical medical battery case is that of a patient who consents to a particular procedure, but who receives treatment different from that which was authorized.[11] For example, in *Pizzalotto v. Wilson*, 437 So.2d 859 (La.1983), a patient consented to exploratory surgery. However, the surgeon, upon finding that her reproductive organs were severely damaged, performed a total hysterectomy, removing all her reproductive organs. The Supreme Court of Louisiana upheld the lower court's finding that the operation was not negligently performed. The court also found, however, that the physician was guilty of battery, because the woman had not consented to the removal of her reproductive organs and no emergency existed which would justify the procedure without her consent. *Id.* at 865.

Hypothetically applying section 78–14–5(1) to the facts of *Pizzalotto* highlights the injustice of subsuming no-consent claims under this section. The patient likely could not prove that she suffered "injury" arising from the surgery, since her reproductive organs were indeed damaged and eventually would have required removal. Nor could she prove that a reasonable person would not have consented to the surgery had she been apprised of the facts. Thus, she likely could not state a cause of action under section 78–14–5(1). We think it unlikely that the Legislature intended a result so at odds with our deeply-rooted societal conceptions about the integrity of the person. Rather, we agree with Justice Cardozo's precept enunciated more than half a century ago, but valid today: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages." *Schloendorff v. Society of New York Hosp.*, 211 N.Y. 125, 105 N.E. 92 (1914), *overruled on other grounds, Bing v. Thunig,* 2 N.Y.2d 656, 163 N.Y.S.2d 3, 143 N.E.2d 3 (1957). Therefore, a physician should ordinarily be required to have the patient's consent before performing any medical procedure. If he does not, the patient should have a cause of action against the physician, irrespective of whether the patient was injured by the procedure. Thus, we hold that the common law remedy of battery, in medical situations where no consent was given, must survive the enactment of section 78–14–5(1).

Lastly, we note that other principles of statutory construction support the conclusion we reach. First, legislation in Utah must be "liberally construed with a view to effect the objects of the statutes and to promote justice." Utah Code Ann. § 68–3–2 (1986). The Legislature's objective, in enacting section 78–14–5, undoubtedly was to codify the common law doctrine of informed consent. However, in light of the fact that a no-consent claim is fundamentally different in nature than a lack of informed consent claim, and considering the

informed consent and no consent. *Revord v. Russell,* 401 N.E.2d 763 (Ind.App.1980); *Dries v. Gregor,* 72 A.D.2d 231, 424 N.Y.S.2d 561 (1980); *Vargas v. Rosal-Arcillas,* 108 Misc.2d 881, 438 N.Y.S.2d 986 (Sup.Ct.1981). We find this contention inaccurate. *Revord* states that "[a]n action prefaced on the doctrine of *informed consent* is now considered as one based on negligence, not battery." 401 N.E.2d at 766 (emphasis added). *Revord* says nothing, however, about the relevant issue in this case: no consent at all. Both *Dries,* 424 N.Y.S.2d at 564, and *Vargas,* 438 N.Y.S.2d at 987–88, contain rather broad language that might plausibly be construed as declaring that all medical consent cases must be pled in negligence. However, later cases make clear that this is an overstatement. *See, e.g., Rigie v. Goldman,* 148 A.D.2d 23, 543 N.Y.S.2d 983, 986 (1989) ("*except* in nonexigent situations involving *no consent at all,* the failure of a doctor to properly inform his patient of the risks of an operation is ... a species of malpractice based upon negligence") (emphasis added).

11. *See, e.g., Moser v. Stallings,* 387 N.W.2d 599 (Iowa 1986); *Kinikin v. Heupel,* 305 N.W.2d 589 (Minn.1981); *Zahorsky v. Griffin, Dysart, Taylor, Penner & Lay, P.C.,* 690 S.W.2d 144 (Mo. App.1985).

plain language of the section, which refers only to "informed consent" claims, there is no reason to believe that the Legislature intended to subsume under section 78–14–5(1) battery actions based on a complete lack of consent. Moreover, as discussed previously, depriving Utah plaintiffs who have received medical care to which they did not consent of any remedy can hardly be viewed as promoting justice.

■ Second, were we to construe section 78–14–5(1) as barring Lounsbury's battery claim, we would be obliged to consider his arguments addressed to the statute's constitutionality. Thus, we construe the statute in a manner which will avoid potential constitutional pitfalls. *Provo City Corp. v. Willden,* 768 P.2d 455, 458 (Utah 1989); *State v. Bishop,* 753 P.2d 439, 497–98 (Utah 1988); *In re J.P.,* 648 P.2d 1364, 1381 (Utah 1982); *State v. Wood,* 648 P.2d 71, 82 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982).

■ In summary, section 78–14–5(1) properly governs claims based on a health care provider's failure to obtain the patient's *informed* consent. Neither Lounsbury nor this court quarrels with the elements the Legislature has required such a claimant to prove. We merely hold that a claim against a health care provider that is based on an allegation that the health care was not consented to at all, is not governed by section 78–14–5(1); rather, it is properly pled on a theory of battery. We confess that the case of a patient ending up in surgery, without having consented to it at all, would appear to be a rare occurrence indeed.[12] However, this is precisely what Lounsbury alleges occurred. If we accept Lounsbury's version of the facts as true, as we must, we are unwilling to conclude that

the Legislature intended to deprive him of any remedy.

■ Therefore, on remand, Lounsbury is entitled to an opportunity to prove his common law claim of battery.[13] We do not here hold that he has done so, nor that he is entitled to recover more than nominal damages if he succeeds in doing so. Lounsbury need not prove injury to sustain his battery claim; if he proves no more than the "offense" of the nonconsensual touching, he is entitled to nominal damages. Damages for pain, suffering, "psychological problems" and the like, however, may of course be recovered only to the extent that Lounsbury proves they were a proximate result of his undergoing the surgery to which he did not consent, rather than a result of his original injury.

## SPOUSAL AUTHORITY TO CONSENT

Lounsbury also challenges the district court's ruling, based on sections 78–14–5(2)(e) and –5(4)(b), that his wife's written consent to his surgery constitutes an absolute defense to his claim that he did not consent to the surgery. Section 78–14–5(2)(e)[14] provides a defense to an informed consent action based on the patient or his representative having signed a written consent. Section 78–14–5(4)(b)[15] provides that a married person is authorized to consent to health care for his or her spouse. Based on the undisputed fact that Lounsbury's wife signed a written consent to Lounsbury's surgery, the district court concluded that his claim was barred.

■ First, we hold that section 78–14–5(2)(e), like 78–14–5(1), relates strictly to *informed* consent cases, and is thus inapplicable to Lounsbury's no-consent battery claim.[16] Section 78–14–5(4), on the other

---

**12.** The legally equivalent scenario of a patient consenting to one procedure but receiving another, as in *Pizzalotto,* is no doubt more common.

**13.** We note that the first sentence of section 78–14–5(1) states that "[w]hen a person submits to health care rendered by a health care provider, it shall be presumed that what the health care provider did was either expressly or impliedly authorized to be done." Utah Code Ann. § 78–14–5(1) (1987). Accordingly, the burden is

properly on Lounsbury to prove that he did not expressly or impliedly consent to his surgery.

**14.** *See* note 4 for the text of this provision.

**15.** *See* note 5 for the text of this provision.

**16.** However, to the extent that subsection 2(e) by the term "representative" incorporates the authorizations in subsection (4), our conclusions regarding spousal consent would also apply to an informed consent case.

hand, makes no reference to only informed consent cases; rather, it is seemingly a broad authorization for married persons to consent to health care for spouses, that may be relied on in the context of any litigation.[17] As such, it could be construed to provide that Mrs. Lounsbury's consent was effectively equal to Lounsbury's consent, thus barring even Lounsbury's battery claim. Lounsbury argues, however, that section 78–14–5(4)(b) should be construed in conjunction with section 78–14–5(3), which states that "[n]othing contained in [the Health Care Malpractice Act] shall be construed to prevent any person eighteen years of age or over from refusing to consent to health care for his own person upon personal or religious grounds." Utah Code Ann. § 78–14–5(3) (1987). Thus, Lounsbury argues that section 78–14–5(4)(b) should be interpreted to authorize a married person to consent to health care for a spouse only in an emergency or if the spouse is otherwise unable to give his or her own consent. We agree.

Counsel have not pointed us to any Utah case which has directly confronted this question.[18] However, Lounsbury supports his contention with a discussion of consent to medical treatment found in *Reiser v. Lohner*, 641 P.2d 93 (Utah 1982). In *Reiser*, the plaintiffs, Mr. and Mrs. Reiser, brought an action for damages arising out of the obstetrical care of Mrs. Reiser. As part of this care, Mrs. Reiser received an amniocentesis to which she admittedly consented. Plaintiffs contended, however, that consent to the amniocentesis should have been obtained from Mr. Reiser as well. The Utah Supreme Court disagreed. It concluded that the consent of Mr. Reiser was not required; rather, "where a married woman is in full possession of her faculties, she alone has the power to submit to surgical procedures upon herself." *Id.* at 99. The court also stated that "[i]t is the settled general rule that in the absence of an emergency or unanticipated condi-

tions, a physician must first obtain the consent of the patient before treating or operating on him." *Id.* at 98.

*Reiser* is distinguishable from the case at bar because it addressed whether the spouse's consent was required in *addition* to the patient's consent, not whether a spouse's consent was an acceptable alternative to the patient's consent. Nevertheless, we are persuaded that the broader principle expressed in *Reiser*, namely that one in possession of one's faculties is solely in charge of one's own body and that a health care provider should resort to obtaining consent from others only if the patient is incapable of consenting, represents the proper view.

Case law on this point appears to be somewhat scarce, but the courts that have discussed the issue have repeatedly emphasized the *patient's* right to make decisions about his or her medical treatment. The basic principle was articulated by the California Supreme Court, which stated that it is the patient's right to decide whether to undergo medical treatment unless he or she is a minor, incompetent, or the situation presents an emergency. *Cobbs v. Grant*, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1, 10 (1972). Absent those limitations, "the decision whether or not to undertake treatment is vested in the party most directly affected: the patient." *Id.* Correspondingly, the physician owes the duty of disclosure to the *patient* so the *patient* can weigh the risks. *Id.* More to the point, courts have opined that the husband and wife relationship does not by itself confer authority on a married person to grant permission for surgery on his or her spouse, except in an emergency. *See, e.g., Beck v. Lovell*, 361 So.2d 245, 250 (La. App.), *cert. denied*, 362 So.2d 802 (La. 1978). *See also Ipock v. Gilmore*, 73 N.C.App. 182, 326 S.E.2d 271, 279–80 (reversing summary judgment for physician because factual issue existed as to whether

---

**17.** In a different context, this rationale has been rejected. The court in *Planned Parenthood Ass'n of Utah v. Dandoy*, 635 F.Supp. 184, 188 (D.Utah 1986), concluded that section 78–14–5(4) is not a "general consent statute"; rather,

its provisions are given effect only in the "context of informed consent as relates to damage suits by a patient." *Id.* at 188 & n. 6.

**18.** *But see* note 17.

husband's consent to wife's surgery was valid "under all the surrounding circumstances"), *cert. denied*, 314 N.C. 116, 332 S.E.2d 481 (1985). In the context of an informed consent case, the Supreme Court of Hawaii held that a physician's duty of disclosure arises from the physician-patient relationship and is owed to the patient himself, not to the patient's spouse or any other family member. *Nishi v. Hartwell*, 52 Haw. 188, 296, 473 P.2d 116, 122 (1970).

We recognize that these opinions do not squarely address the issue at hand because they were not construing, as we are, a legislative grant of authority to a married person to consent to treatment for a spouse. Nevertheless, they are persuasive because they are consistent with the underlying premise of all law surrounding consent to medical treatment: a patient has a right of privacy and self-determination as regards his or her own medical care.

Moreover, in this regard, we note that section 78–14–5(4)(b) might well be unconstitutional if we view the spouse's authorization to consent as absolute, irrespective of the patient's ability and desire (or lack thereof) to consent. As we have noted, every adult has a right to determine what is done with his or her own body; and this right is constitutionally protected. *See, e.g., Conservatorship of Drabick*, 200 Cal. App.3d 185, 245 Cal.Rptr. 840, 853 & n. 20, *cert. denied*, 488 U.S. 958, 109 S.Ct. 399, 102 L.Ed.2d 387 (1988). Therefore, if section 78–14–5(4)(b) were construed to confer absolute authority on a married person to consent to his or her spouse's surgery, without any deference to the spouse's own right to consent, its constitutionality would certainly be questionable.[19] Therefore, we construe section 78–14–5(4)(b) in a manner that avoids the potential for constitutional infirmity, by interpreting the authorization

for spousal consent as a secondary option, to be relied on only in cases of emergency or other incapacity of the patient.[20]

Lastly, it is not sufficient for Dr. Capel to contend that consent by Lounsbury's wife was appropriate in view of the fact that, at the precise moment Mrs. Lounsbury consented, Lounsbury had been given preoperative medication and thus was incapacitated. We are persuaded in this regard by the reasoning in *Eis v. Chesnut*, 96 N.M. 45, 627 P.2d 1244 (App.), *cert. denied*, 96 N.M. 116, 628 P.2d 686 (1981). In *Eis*, it was undisputed that the patient, Mrs. Eis, did not consent to the surgery she received; rather, her daughter had signed the consent form because Mrs. Eis was "confused." 627 P.2d at 1245. The court of appeals explained that the patient's consent is required unless 1) the patient is "unconscious or otherwise incapable of consenting" or 2) the patient is so ill or distraught that disclosure of the risks to the patient would threaten the patient's well-being. *Id.* at 1247.

The court noted there was "no evidence … that the operation was performed in an emergency, or that Mrs. Eis was confused for such a long period of time as to preclude obtaining her consent to the operation." *Id.* On the contrary, the hospital notes of that day indicated that Mrs. Eis was only temporarily disoriented on the day before the surgery when her daughter's consent was obtained. *Id.* Accordingly, the court reversed the trial court's entry of summary judgment for the defendant physician, holding that a genuine issue of fact existed regarding whether the patient's consent could reasonably have been obtained. *Id.*

**19.** At a minimum, section 78–14–5(4)(b) could not possibly be constitutional insofar as it purports to authorize spousal consent to override the patient's own *refusal* to consent, as Lounsbury alleges occurred in this case.

**20.** We do not here address the other authorizations to consent contained in section 78–14–5(4). However, even from a cursory glance, it is apparent that the other authorizations are not problematic in the way the spousal authorization to

consent is. The other provisions authorize various persons to consent to health care either for themselves, for a minor, or for a person who is unable to consent by reason of age, physical or mental condition. *See Utah Code Ann.* § 78–14–5(4)(a), (c)–(h) (1987). Only the spouse provision at issue here, section 78–14–5(4)(b), arguably purports to authorize a representative to consent for a perfectly competent adult patient.

Similarly, in Lounsbury's case, Dr. Capel may not rely on the temporary incapacity of Lounsbury, induced by preoperative medication, as a reason to resort to obtaining consent from Mrs. Lounsbury. It is undisputed that obtaining Mrs. Lounsbury's consent to Lounsbury's surgery was not necessitated by emergency. Moreover, spousal consent is particularly suspect in a case such as this where, taking Lounsbury's version of the facts as true, Mrs. Lounsbury's consent followed on the heels of Lounsbury's own repeated refusals to consent. Accordingly, we remand, holding that Lounsbury should be entitled to prove there was reasonable opportunity for him to competently give his own consent. If the facts are as Lounsbury claims, then his wife's consent is invalid and does not bar his battery claim.

## CONCLUSION

First, we hold that section 78–14–5(1) of the Health Care Malpractice Act governs only claims based on lack of *informed* consent. Thus, the district court erred in concluding that Lounsbury's claim, premised on his allegation that he gave *no* consent whatsoever, must meet the requirements of section 78–14–5(1). On remand, Lounsbury is entitled to an opportunity to prove his common law claim of battery, and damages proximately resulting therefrom. Second, we interpret section 78–14–5(4)(b) of the Health Care Malpractice Act as authorizing a married person to consent to health care for his or her spouse only in cases of emergency, or where the spouse is otherwise unable to give his or her own consent. Moreover, the mere temporary incapacity of the patient will not serve as justification for obtaining consent from the patient's spouse, if there was a reasonable opportunity to obtain the patient's own consent. The judgment appealed from is reversed and the case remanded for trial or other proceedings consistent with this opinion.

GREENWOOD, J., concurs.

BENCH, Presiding Judge (concurring specially):

While I otherwise concur in the court's opinion, I do not join in the discussion concerning any potential constitutional infirmity of subsection 78–14–5(4)(b) (granting spouses authority to consent). The issue of whether a spouse could be statutorily granted the authority to override his or her spouse's refusal to consent is purely theoretical because no such authority is granted by the statute at issue.

Subsection 78–14–5(3) expressly states: "Nothing contained in this act shall be construed to prevent any person eighteen years of age or over from refusing to consent to health care for his own person upon personal or religious grounds." In my view, the foregoing limitation is plain and unambiguous and fully resolves the question of whether Lounsbury's wife was granted any statutory authority to override his refusal to consent. She was not.

When read in context, subsection 78–14–5(4)(b) does not purport to authorize a spouse to override a patient's refusal to consent because such an interpretation would be directly contrary to subsection 78–14–5(3). There is, therefore, no plausible unconstitutional interpretation before us to be considered and rejected.

Any discussion of theoretical issues is contrary to our longstanding judicial policy to avoid rendering advisory opinions. *See, e.g., Reynolds v. Reynolds,* 788 P.2d 1044, 1045 (Utah App.1990). The language regarding the possible constitutional infirmity of subsection 78–14–5(4)(b) is also contrary to our "fundamental rule that this court should avoid addressing constitutional issues unless required to do so." *State v. Anderson,* 701 P.2d 1099, 1103 (Utah 1985).

The opinion's advisory language regarding any imagined constitutional infirmity of subsection 78–14–5(4)(b) is theoretical dicta. I therefore do not concur therein.